**LAJUANA A. REID**
7839 Lockwood Street
Oakland, California 94621
Telephone: (510) 761-5688

**FILED**

JAN 10 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAJUANA A. REID, | **Case No.:** C25-00383 TSH |
| Plaintiff/Petitioner, | 5 U.S.C. § 552a; 5 U.S.C. § 552a(b)(7) |
| v. | 18 U.S.C. §§ 241, 242; 18 U.S.C. § 1001; |
| CITY OF OAKLAND, a municipal | 18 U.S.C. § 1030; 18 U.S.C. § 1201; 18 U.S.C. |
| corporation; JOHN JACKO ROMERO, | § 1117; 18 U.S.C. § 1346; 18 U.S.C. § 1510; 18 |
| individually and in his official capacity as a | U.S.C. §§ 1512, 1519;18 U.S.C. § 1591; 18 |
| police officer for the City of Oakland; | U.S.C. § 1621; 18 U.S.C. §§ 1961–1968;18 |
| JANEY LORRAINE MEEKS-HAY, | U.S.C. §§ 2340–2340A; 18 U.S.C. § 2511; 42 |
| individually and in her official capacity as a | U.S.C. §§ 1983, 1985, 1986; Cal. Civil Code § |
| police officer for the City of Oakland; | 52.1; Cal. Civil Code §§ 44–46, Cal. Civil Code |
| VICTORIA LYNN DENARDI, individually | § 3294;Cal. Penal Code § 118.1; Cal. Penal |
| and in her official capacity as a police officer | Code §§ 182, 187; Cal. Penal Code §§ 207, 236; |
| for the City of Oakland; MARK | Cal. Penal Code § 206; Cal. Penal Code §§ 135, |
| WOODROW WILSON, individually and in | 141; Cal. Penal Code § 240; Cal. Penal Code § |
| his official capacity as a former police | 243.4; Cal. Penal Code § 273.6; Cal. Penal Code |
| officer for the City of Oakland; DOES | § 422; Cal. Penal Code § 422.6; Cal. Penal Code |
| 1-100, inclusive, | § 459; Cal. Penal Code § 602; Cal. Penal Code § |
| Defendant/Respondent | 632; Cal. Penal Code § 646.9; Cal. Penal Code § |
| | 647. **JURY TRIAL DEMANDED** |

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & DAMAGES - 1

**INTRODUCTION**

1.      I, LAJUANA A. REID, an African-American woman from Oakland, California, and a retired Administrative Data Specialist from the University of California, Berkeley, Continuing Education of the Bar, file this lawsuit with no criminal record and a longstanding history of professional integrity. My experience exposes not only the crimes committed against me but also reveals systemic failures within local law enforcement that demand accountability. I bring this lawsuit under the Continuing Violation Doctrine.

2.      This case exposes a blatant conspiracy of corruption and severe civil rights violations within the CITY OF OAKLAND, the OAKLAND POLICE DEPARTMENT, its CANNABIS UNIT, INTELLIGENCE UNIT, INTERNAL AFFAIRS, and DISPATCHERS, all of whom actively facilitated misconduct. At the center of this operation is Officer JOHN JACKO ROMERO—the sole officer assigned to the Cannabis Unit and a complete stranger to me—who orchestrated my kidnapping, a crime for which there is no statute of limitations under federal and California law, to protect his cousin, Moses JACKO Jr., and his illegal cannabis cultivation and sales operation next door. I had reported this operation by phone to CITY OF OAKLAND CODE ENFORCEMENT

3.      In a highly irregular and unprecedented abuse of power, **Officer ROMERO personally hand wrote** every key document used to justify my unlawful detention. This included:

- A **false Citizens' Crime Report** (19-048359) dated August 15, 2019, written on behalf of his cousin, Moses Jacko,

- A **fraudulent Elder Abuse Temporary Restraining Order** (HF19035537) dated September 17, 2019, which he also wrote on behalf of his cousin, Moses Jacko, and

- A **Reporting Party (RP) card** on October 1, 2019, falsely alleging a violation of the restraining order he himself had fabricated.

4.    Furthermore, on September 6th, 2019, at 13:42, Moses Jacko, who at that point did not even know my name, requested assistance from Officer Vallalba in obtaining my information to file a restraining order against me (as confirmed in Incident Report #190905000917).

5.    This directly contradicts the Citizens' Crime Report that Officer ROMERO created on August 15th, 2019, in which he intentionally included my name despite the fact that Jacko had no knowledge of my identity. How could Officer ROMERO have written a Citizens' Crime Report on August 15th, 2019, that included me as a suspect, when Jacko didn't even know my name as late as September 6th, 2019?

6.    This glaring inconsistency demonstrates that the report was not based on any legitimate facts, but was instead a fabricated and premeditated document designed to manufacture probable cause and justify unlawful actions against me.

7.    This deliberate action also constitutes a violation of the OAKLAND POLICE DEPARTMENT's Memorandum of Rules, specifically sections 398.80 (Truthfulness) and 398.96 (Civil Cases), as Officer ROMERO knowingly created false reports and used his position to intervene in civil matters to support a personal agenda. These rules mandate that officers are required to provide truthful information and avoid involvement in civil cases unless required by law. Officer ROMERO's actions directly violated these provisions and underscore the calculated nature of his misconduct.

8.    A handwriting analysis has confirmed that Officer ROMERO wrote all key documents, including the Citizens' Crime Report, the Temporary "ELDER ABUSE" Restraining Order, and the RP card. This expert analysis further supports the claim that Officer ROMERO deliberately authored and manipulated documents to create a false narrative and justify his unlawful actions.

9.    This timeline discrepancy further exposes the deliberate fabrication of evidence and intentional misconduct by Officer ROMERO, who not only created false documentation but also orchestrated an entire legal process based on fabricated claims.

10.     By single-handedly creating and handling every element necessary to manufacture the false charges against me, Officer ROMERO bypassed normal legal and procedural checks and balances designed to prevent abuses of power. This manipulation of the legal system unfolded over a 48-day period, within 60 days of me moving into my home, culminating in my unlawful detention and kidnapping. These documents can be found in Alameda County Superior Court under case numbers HF19035537 and RG20058505, as well as under City of Oakland Next Request FOIA 21-8634 (https://oaklandca.nextrequest.com/documents/9777027).

11.     After these documents were filed with the OAKLAND POLICE DEPARTMENT and Alameda County Superior Court, Officer ROMERO falsely claimed a violation of the very restraining order he had fabricated. The handwritten RP card, created by Officer ROMERO, can be seen in the hands of Officers MARK WOODROW WILSON and VICTORIA LYNN DENARDI on Officer WILSON's body camera footage (2019/10/01 18:03:47 GMT-7, LE5-012431), while I was already in custody, sitting in the back of their police car. WILSON can be heard asking DENARDI, 'Uhh, you have the RP?' to which DENARDI responded by handing him the card, written by Officer JOHN JACKO ROMERO, with both my name and his cousin's name, 'MOSES JACKO.' At 17:47:33, this is captured on Officer WILSON's body camera, with Moses Jacko asking Officer WILSON and DENARDI if they know John ROMERO. Officer WILSON replies, 'Yes.' Moses Jacko then says, 'That's my cousin,' to which Officer WILSON responds, 'Alright.'

12.     The absurdity of this case is evident. I was arrested based on a Reporting Party (RP) card authored by Officer John Jacko ROMERO, who is the cousin of Moses Jacko, the individual making the verbal allegations against me. Body camera footage clearly proves that Officers WILSON and DENARDI were aware of ROMERO's familial connection to Jacko as they proceeded to my home to execute my arrest. This means my unlawful detention was carried out based on a document created by a relative within law enforcement of the alleged victim,

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & DAMAGES - 4

underscoring a blatant conflict of interest and a shocking disregard for the integrity of the legal process. It is unfathomable that law enforcement officers would knowingly rely on such compromised evidence to justify a supposed lawful arrest.

13.     This calculated series of actions reveals a profound abuse of official power for personal gain, with irrefutable evidence – including body camera footage showing the handwritten RP card being exchanged after my arrest – exposing the depths of this corruption and the severity of the crimes committed against me.

14.     This calculated series of actions reveals a profound abuse of official power for personal gain, with irrefutable evidence – including body camera footage showing the handwritten RP card being exchanged after my arrest – exposing the depths of this corruption and the severity of the crimes committed against me.

15.     The organized gang stalking I experienced began in 1999, leading to a restraining order against the individual responsible. In 2003, a permanent lifetime restraining order (Restraining Order No. C-821205) was granted. By 2000, I noticed strangers participating in the harassment, captured on my surveillance cameras. I later understood this as part of organized gang stalking.

16.     During this time, my car tires were slashed, windows broken, door locks glued, and I was frequently followed. Poison was once thrown in my face. Despite reporting these incidents, no law enforcement agency intervened. The OAKLAND POLICE DEPARTMENT's refusal to investigate escalated the harassment.

17.     In one incident, my new SUV with less than 3,000 miles was totaled in my driveway. OPD refused to investigate, instructing me to clean it up. An officer speculated the substance thrown inside was a ground-up animal. The stench was unbearable, leaving me traumatized.

18.     The pattern of harassment and surveillance I experienced since 1999 laid the groundwork for Officer ROMERO's later actions. By 2019, when I reported the illegal cannabis operation, ROMERO exploited the existing infrastructure of illegal watchlisting and surveillance to escalate

the harassment. He leveraged the history of ignored complaints and OPD's reluctance to investigate to his advantage. ROMERO's fabrication of evidence and orchestration of my kidnapping represent a continuation and intensification of the systemic misconduct I had been subjected to for over two decades. This demonstrates a clear pattern of escalating abuse of power, from initial harassment to full-blown conspiracy and civil rights violations.

19.     To further substantiate my claims, I retained the services of one of the top licensed security specialists in the country. This expert, recognized nationally for expertise in surveillance detection and countermeasures, conducted a thorough NLJD (Non-Linear Junction Detector) analysis and provided a detailed report confirming that I am being tracked in real time. The report outlines the technologies and methods used to facilitate unauthorized monitoring, including the use of the Citizens App and other surveillance tools leveraged by OPD.

20.     The findings presented by this expert offer independent verification of the surveillance I have endured, adding third-party confirmation that reinforces the evidence I have gathered over the years. This report directly contradicts any attempts to frame my experiences as delusional and further exposes the operational structure supporting the harassment.

21.     I confirmed my illegal watchlist status after my kidnapping on October 1, 2019, when my Watch List Subject Number (9596690-00) appeared on the Oakland Police crime report (19-051168). This confirmed that the surveillance and harassment I continue to endure are part of systemic targeting by OPD, further corroborated by the expert report and the 368 internal OPD documents disclosed through FOIA Request 22-6300, which include instructions for officers on how to create a false mental health narrative against victims. Following my kidnapping and mounting public pressure, the City of Oakland, in December 2020, took action and moved to ban predictive policing and biometric surveillance tools, recognizing the dangers these systems pose to civil rights.

22.    On the day of my kidnapping, the timing of my movements aligns with the reset of the incident recall by the Oakland Police. My receipts from both the Ebony Beauty Supply store and FoodMaxx, along with my Google location history showing my transactions and movements that afternoon, confirm this and correspond with the time the police reset their incident recall. This suggests that the authorities were able to track my movements, potentially through fusion centers, my debit card transactions, and/or other suspected methods. The appearance of my Watch List Subject Number on the Oakland Police crime report further validates that my surveillance and harassment were part of a targeted, systemic effort by OPD."

23.    For years, my efforts to expose ongoing harassment were actively obstructed by the OAKLAND POLICE DEPARTMENT. In 2003, when I independently traced harassing calls through AT&T, the resulting report was forwarded to OPD without my consent. When I requested the report, Oakland Police refused to release it. This suppression of evidence allowed the harassment to continue unchecked, reinforcing the involvement of OPD in protecting those responsible.

24.    Officer ROMERO, with the assistance of his co-workers, DISPATCHERS, and INTERNAL AFFAIRS, not only fabricated evidence but controlled, manipulated, and ultimately destroyed the very evidence he created to justify illegal actions and cover up misconduct. Internal investigations were compromised to shield Officer ROMERO, his co-workers, and their informants, ensuring that critical records supporting my claims were either altered or withheld.

25.    The security expert's findings further expose these tactics, demonstrating how illegally implanted surveillance mechanisms and tracking technologies are central to this long-standing campaign of harassment. This evidence reveals the depth of OPD's involvement and systematic efforts to manipulate records, fabricate mental health narratives, and erase documentation that could validate my claims.

26.     **Retaliation and Targeting** – After reporting the overwhelming stench of illegal cannabis cultivation from the house next door in August 2019, belonging to Moses Jacko Jr., cousin of Officer ROMERO, I became the target of retaliation. Officer ROMERO, the sole officer assigned to the OAKLAND POLICE DEPARTMENT's Cannabis Unit, led a calculated campaign of harassment, slander, and fabricated complaints to silence me.

27.     **Complicity of Dispatchers and Internal Affairs** – Dispatchers knowingly facilitated the orchestration of false 911 calls and fabricated complaints, creating records that further justified ROMERO's illegal actions. INTERNAL AFFAIRS failed to intervene or conduct unbiased investigations, actively participating in the cover-up through falsified reports and suppressed evidence (IA Report 21-0195 and 21-0822).

28.     **Abuse of Advanced Surveillance Technology** – AXON body camera technology was weaponized to conduct illegal surveillance. Selective recording, manipulated footage, and staged 'body cam acting' were used to fabricate probable cause, manipulate evidence, and bypass accountability, enabling further violations of my rights.

29.     **Administrative Kidnapping and Ransom** – The most egregious violation I endured was an orchestrated kidnapping by Officer ROMERO, executed through fabricated documents and abuse of administrative and judicial processes. Officer ROMERO and his co-workers manipulated the administrative and judicial processes, exploiting the "garbage-in, gospel truth out" process—where false reports and fabricated complaints were submitted into the system and treated as unquestionable facts. These false documents were then used to justify probable cause and authorize actions, including my kidnapping. This ensured that all measures were in place to justify the use of force—even deadly force—had I resisted or reacted to being kidnapped.

30.     My FOIA request revealed that on the day of my kidnapping, OPD began broadcasting over police radio traffic at 0821 hours, repeatedly announcing my name, "LaJuana Reid," along with my home address, and falsely reporting that I was 5150 and experiencing a mental health

crisis. These broadcasts continued until 1822 hours (Incident Recall 191001000221) — long after I had been kidnapped, despite Officer Carrillo documenting at 1809 hours that my demeanor was calm and polite (Incident Report 19-051168; Page 1). Between 0900 and approximately 1545 hours, I was out shopping and running errands.

31.    The persistence of these false broadcasts reflects the deliberate and calculated nature of the campaign to discredit and target me. This information, corroborated by the full radio traffic record accessible at oaklandca.nextrequest.com/requests/21-8245, demonstrates the depth of systemic misconduct within OPD. In December 2020, just over a year after my kidnapping, the City of Oakland banned predictive policing and biometric surveillance tools, reflecting recognition of the dangers and abuses tied to these systems.

32.    Officers WILSON and DENARDI's body cameras broadcast the kidnapping in real-time to Officer JOHN JACKO ROMERO and Officer JANEY MEEKS-HAY, who orchestrated my abduction but deliberately remained off-site to avoid direct accountability. Officer WILSON and DENARDI's use of body cam acting ensured the appearance of justification, concealing the falsification of reports and staged detainment. Officer ROMERO acted as the mastermind of this unlawful operation, with Officer JANEY MEEKS-HAY coordinating the execution of this grave violation of my rights.

33.    Despite being the victim, I was forced to investigate my own kidnapping, orchestrated by a complete stranger, Officer ROMERO.

34.    A ransom of $20,000 in the form of bail was imposed following this illegal abduction, and fraudulent criminal charges remained pending against me for six months before ultimately being dismissed. At one point, I was court-ordered to leave my own home and remain at least 100 yards away from Moses Jacko. My Public Defender, Amy Golinveaux, had to request a court hearing after the New Year to allow me to return to my home.

**Outcomes and Demands:**

35.    The fraudulent misdemeanor criminal charges were dismissed after six months, and I successfully obtained civil (RG20058505) and criminal protective (CPO 1803176) orders against Moses Jacko Jr. However, despite these court orders, OPD repeatedly failed to enforce them, allowing Jacko's continued harassment and repeated violations. This deliberate inaction underscores OPD's complicity and further exposes the coordinated effort to shield Jacko and retaliate against me. Jacko later testified multiple times, stating, "The police told me to do it!" and declaring, "I'm 300 pounds; I'm not afraid of her.

36.    I demand full accountability from all involved parties, substantial financial compensation for the harm inflicted upon me, and disciplinary action against those in DISPATCH and INTERNAL AFFAIRS who actively facilitated or covered up these crimes. Dispatchers and officers involved also falsely documented information to construct a false mental health narrative, furthering the effort to justify illegal surveillance, harassment, and ultimately, my kidnapping.

37.    Relevant Precedents:

- **Texas v. Gerald Goines (2021):** Former Houston officer charged with murder and other felonies for fabricating evidence and orchestrating wrongful arrests, exposing systemic corruption and fatal consequences.

- **Spencer v. Krause (9th Cir. 2017):** Fabricated evidence by state officials violates the Fourteenth Amendment.

- **Saunders-El v. Rohde (7th Cir. 2015):** Withholding and fabricating evidence violates due process.

- **Allen v. City of Oakland (N.D. Cal. 2000):** Oakland Police corruption case involving kidnapping and planted evidence led to federal oversight.
- **Kirstin Lobato v. Las Vegas Metro Police:** Wrongful conviction overturned due to fabricated evidence and misconduct.

38.    These precedents emphasize the judicial system's acknowledgment of the grave danger posed by fabricated evidence, wrongful arrest, and systemic abuse of power by law enforcement. However, my case goes beyond these established examples, representing the first documented instance of administrative kidnapping orchestrated by an OAKLAND POLICE DEPARTMENT officer.

39.    This unprecedented abuse of power builds upon a long-standing pattern of corruption within the OAKLAND POLICE DEPARTMENT and exposes a new and dangerous dimension of law enforcement misconduct. The calculated nature of this kidnapping—executed through **false reports, manipulated judicial processes, and the exploitation of surveillance technology—*marks a disturbing evolution that demands immediate legal and judicial intervention.

40.    My case serves as a critical call to action, underscoring the urgent need for comprehensive reform within the OAKLAND POLICE DEPARTMENT and setting a new standard for accountability in law enforcement across the nation.

41.    This case is not just about seeking justice for myself but also about exposing the systemic abuses of power within the OAKLAND POLICE DEPARTMENT that continue to harm others. Angela Sutton, another Black woman with no criminal record, was also victimized by OPD in a similar manner (Incident No. 12-060385). Her illegal surveillance and targeting bear striking similarities to my own experience, further underscoring that my case is not an isolated incident but part of a broader, deeply rooted pattern of misconduct. This case represents not only those who have been harmed and silenced but also those who lack the evidence, resources, or

knowledge to pursue justice. By bringing these abuses to light, I aim to hold those responsible accountable and to push for the systemic reforms needed to ensure that no one else endures the violations we have suffered.

## JURISDICTION AND VENUE

42.    This action arises under federal law, including 18 U.S.C. §§ 1961–1968 (Racketeer Influenced and Corrupt Organizations Act, "RICO"), 42 U.S.C. §§ 1983, 1985, and 1986, 18 U.S.C. §§ 241 (Conspiracy Against Rights), 242 (Deprivation of Rights Under Color of Law), 1201 (Kidnapping), 1346 (Scheme or Artifice to Defraud), 1117 (Conspiracy to Commit Murder), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. §§ 1510 (Obstruction of Criminal Investigations), 1512 (Tampering with Witnesses, Victims, or Informants), 1519 (Destruction or Alteration of Records), 18 U.S.C. §§ 2340–2340A (Torture Statute), 18 U.S.C. § 2511 (Wiretap Act), 18 U.S.C. § 1591 (Human Trafficking), and 18 U.S.C. § 1621 (Perjury).

43.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, as these claims involve federal questions concerning violations of constitutional rights and federal statutes.

44.    This Court also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367, including claims brought under California Civil Code § 52.1 (Bane Act), California Civil Code §§ 44–46 (Defamation, Libel, and Slander), California Civil Code § 3294 (Punitive Damages), and California Penal Code §§ 182 (Criminal Conspiracy), 187 (Conspiracy to Commit Murder), 207 (Kidnapping), 236 (False Imprisonment), 206 (Torture), 240 (Assault), 646.9 (Stalking), 632 (Invasion of Privacy), 148.6 (False Complaints Against Peace Officers), 422 (Criminal Threats), 459 (Burglary), 647 (Disorderly Conduct), and 135, 141 (Evidence Tampering).

45.    These state law claims arise from the same nucleus of operative fact as the federal claims, specifically the alleged fabrication of evidence, conspiracy, illegal watchlisting, and administrative aggravated kidnapping, and therefore form part of the same case or controversy under Article III of the United States Constitution.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as all the unlawful acts and practices alleged herein occurred in Oakland, California, within Alameda County, which lies in this judicial district. Specifically, the actions complained of—including the fabricated Citizens Crime Report (19-048359), the fraudulent Elder Abuse Temporary Restraining Order (HF19035537), the Reporting Party (RP) card, and the **administrative aggravated kidnapping—**were perpetrated by defendants operating in Oakland. Plaintiff's residence, the offices of the defendants, and the locations of key events central to this case are all within this judicial district.

47.    The continuous nature of harm alleged in this case, including illegal watchlisting, surveillance, and harassment, justifies equitable tolling under the Continuous Wrong Doctrine. Each act of surveillance, harassment, and obstruction constitutes a new and ongoing harm, directly linked to the original violations and perpetuated by the defendants.

## **PARTIES**

48.    Plaintiff LAJUANA A. REID (hereinafter, "PLAINTIFF") is, and at all times herein mentioned was, a resident of Oakland, California, an African-American woman, and a natural person.

49.    Defendant CITY OF OAKLAND (hereinafter, "CITY") is, and at all times mentioned herein was, a municipal corporation, duly authorized to operate under the laws of the State of California. Under its supervision, the CITY operates the OAKLAND POLICE DEPARTMENT ("Oakland Police").

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & DAMAGES - 13

50.    Defendant JOHN JACKO ROMERO (hereinafter, "DEFENDANT ROMERO"), Serial No. 8927, Badge No. 902, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

51.    Defendant JANEY LORRAINE MEEKS-HAY (hereinafter, "DEFENDANT MEEKS-HAY"), Serial No. 9122, Badge No. 467, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

52.    Defendant MARK WOODROW WILSON (hereinafter, "DEFENDANT WILSON"), Serial No. 9491, Badge No. 869, was at all times relevant to this action a Police Officer for the CITY OF OAKLAND and is now a former officer. Despite his current status, DEFENDANT WILSON played a critical role in orchestrating and carrying out PLAINTIFF's kidnapping and remains a defendant in this case.

53.    Defendant VICTORIA LYNN DENARDI (hereinafter, "DEFENDANT DENARDI"), Serial No. 9461, Badge No. 825, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

54.    Defendant CHRISTOPHER KELLEY (hereinafter, "DEFENDANT KELLEY"), Serial No. 9709, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

55.    Defendant BINH TRAN (hereinafter, "DEFENDANT TRAN"), Serial No. 9559, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

56.    Defendant KITO YSLAVA (hereinafter, "DEFENDANT YSLAVA"), Serial No. 8913, Badge No. 516, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

57.    Defendant OMAR ASHFORD (hereinafter, "DEFENDANT ASHFORD"), Serial No. 8021, Badge No. 146, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

58.   Defendant GORDON DORHAM (hereinafter, "DEFENDANT DORHAM"), Serial No. 8946, Badge No. 956, was at all times herein mentioned a Police Officer for the CITY OF OAKLAND.

59.   Defendant ZELUNETTE MCKELLAR (hereinafter, "DEFENDANT MCKELLAR"), Serial No. 4301, Dispatch No. 51, was at all times herein mentioned a Senior Police Communications Dispatcher for the CITY OF OAKLAND.

60.   Defendant CHABLIS DELOVE (hereinafter, "DEFENDANT DELOVE"), Serial No. 4957, Dispatch No. 70, was at all times herein mentioned a Police Communications Dispatcher for the CITY OF OAKLAND.

61.   Defendant KARLANA INGRAM (hereinafter, "DEFENDANT INGRAM"), Serial No. 4791, Dispatch No. 8, was at all times herein mentioned a Police Communications Dispatcher for the CITY OF OAKLAND.

62.   Defendant SAMANTHA MICHELLE TAYLOR (hereinafter, "DEFENDANT TAYLOR"), Serial No. 4961, Dispatch No. 74 (47), was at all times herein mentioned a Police Communications Dispatcher for the CITY OF OAKLAND.

63.   Defendant RODNEY WOODSON (hereinafter, "DEFENDANT WOODSON"), Serial No. 4959, Dispatch No. UNKNOWN, was at all times herein mentioned a Police Communications Dispatcher for the CITY OF OAKLAND.

64.   Defendant ESTATE OF MOSES JACKO JR. (hereinafter, "DEFENDANT ESTATE"), representing the deceased Oakland Police criminal informant Moses JACKO Jr., was at all times relevant to this action a criminal informant for the CITY OF OAKLAND. The estate is named as a defendant in connection with the actions of Moses JACKO Jr. during his involvement in the events described herein.

65.   DOES 1 THROUGH 50 (FICTITIOUS DEFENDANTS) PLAINTIFF is currently unaware of the true names and capacities of defendants sued herein as DOES 1 through 50

inclusive and therefore sues these defendants by such fictitious names. PLAINTIFF will amend this complaint to include the true names and capacities of these defendants once they are ascertained. PLAINTIFF alleges that each of these DOE defendants is legally responsible for the incidents, These defendants proximately caused PLAINTIFF's injuries through their negligence breach of duty negligent supervision management control violation of public policy and/or use of excessive force.

66.     injuries and damages described herein.

67.     Each defendant is liable for his/her own personal conduct as well as through vicarious or imputed negligence fault or breach of duty whether severally or jointly and whether arising from agency employment ownership entrustment custody care or control.

68.     PLAINTIFF will seek leave to amend this complaint as discovery progresses.

### ACTING UNDER COLOR OF LAW

69.     The DEFENDANT POLICE OFFICERS and OAKLAND POLICE COMMUNICATION DISPATCHERS, in engaging in the conduct alleged herein, acted under color of law, exercising their authority as agents and employees of the CITY OF OAKLAND. Despite the legal authority conferred by their positions, they knowingly exceeded the bounds of their lawful powers by conspiring to falsify 911 calls, fabricate reports, and orchestrate events designed to violate PLAINTIFF's constitutional rights.

70.     These actions, taken in the course and scope of their employment as law enforcement officers and dispatchers, constitute a deliberate misuse of official power under the United States Constitution, particularly violating PLAINTIFF's rights under:

- The Fourth Amendment – Protection against unlawful search and seizure;
- The Fifth Amendment – Deprivation of liberty without due process;
- The Fourteenth Amendment – Equal protection and due process.

71.     These actions are actionable under 42 U.S.C. § 1983, which permits civil suits against

individuals who, under color of law, deprive others of their constitutional rights, and 18 U.S.C.

§§ 1961–1968 (RICO), addressing patterns of criminal conspiracy and racketeering activity.


72.     EXCLUSION OF SPECIFIC OFFICERS

PLAINTIFF specifically excludes the following individuals from the allegations made in this

complaint due to their documented conduct, which does not align with the wrongful actions

alleged against the other defendants. These exclusions are based on clear distinctions in their

involvement and handling of the incidents related to this case:

a. Officer Carlos Carrillo

Officer Carrillo documented that PLAINTIFF's demeanor was calm and polite during the

incident in question, contradicting false claims made by other defendants, including Officer

Mark WILSON and various dispatchers, who falsely reported behavior consistent with a 5150

hold. Carrillo's accurate documentation of PLAINTIFF's behavior demonstrates a commitment

to the truth; therefore, Officer Carrillo is excluded from this complaint.

b. Evidence Technician Ca'ron James

Although Evidence Technician Ca'ron James issued the incident report number associated with

ROMERO's false Citizens Crime Report against PLAINTIFF, James notably did not list

PLAINTIFF as the perpetrator on her incident report. This deliberate omission contradicts

ROMERO's false claims and reflects Technician James' integrity in documenting the incident

accurately. PLAINTIFF recognizes this distinction and, therefore, excludes Technician James

from this complaint.

c. Officer Billy Matthews

As the supervisor of Officer Carlos Carrillo, Officer Billy Matthews did not interfere with or alter Carrillo's accurate documentation of the incident. Despite possible personal connections to Officer ROMERO, Matthews allowed truthful reporting to proceed and did not suppress or distort facts. Accordingly, Officer Billy Matthews is excluded from this complaint.

## STATEMENT OF FACTS

73.    **August 1, 2019:** PLAINTIFF closed escrow and moved into her new home.

74.    **August 2-3, 2019:** Due to the overwhelming stench, PLAINTIFF reported by phone the illegal cannabis cultivation at 7833 Lockwood Street, operated by Moses Jacko Jr., to the CITY OF OAKLAND CODE ENFORCEMENT. At the time, PLAINTIFF was unaware of Officer ROMERO's existence, his relationship to Moses Jacko Jr., or that ROMERO oversaw the Cannabis Unit. Despite multiple FOIA requests, the CITY OF OAKLAND has refused to provide the incident number or a copy of PLAINTIFF's phone complaint.

75.    **August 4, 2019:** Three days after PLAINTIFF moved in next door to Moses Jacko Jr.'s residence, Officers VICTORIA DENARDI and MARK WILSON conducted what appeared to be an informant debriefing disguised as a response to a false burglar alarm. On August 4, 2019, under Incident Number 190804000713, these officers visited 7833 Lockwood Street claiming to respond to a 933R (Suspicious Circumstances) call.

76.    The officers' documentation contained several red flags. They cited a fictitious alarm company, "Vivant" (a misspelling of the legitimate company Vivint), despite the fact that Jacko's house had no alarm system—his windows would not even close, and he relied on pit bulls for security.

77.    When PLAINTIFF later requested the 911 call recording through a FOIA request, the OAKLAND POLICE DEPARTMENT claimed their dispatch console was down, an implausible excuse given that all 911 operators have backup consoles.

78.    Furthermore, when PLAINTIFF inquired about the number of times Officers DENARDI and WILSON had been dispatched to Moses Jacko's residence prior to her October 1 kidnapping, OPD refused to provide records, citing California Government Code 6255.

79.    These same officers, DENARDI and WILSON, would later execute PLAINTIFF's October 1 kidnapping. Following this staged event, Moses Jacko began making multiple false 911 calls against PLAINTIFF, accessing a direct line to PSAP 911 operators via T-Mobile (877-653-7911), a line reserved for law enforcement, criminal informants, and cooperating witnesses. This established a pattern of harassment that would continue to escalate.

80.    **August 8, 2019:** PLAINTIFF filed Code Enforcement  complaint #1903576 regarding a large tent in the front yard of 7833 Lockwood Street obstructing neighbors' views. Multiple cars were parked on the lawn along with debris.

81.    **August 12, 2019**: PLAINTIFF filed Code Enforcement complaint #1903651 detailing ongoing neighborhood harassment issues, including prior incidents that appeared to be a continuation of organized harassment she had experienced before moving next door to Moses Jacko. This complaint documented the pattern of coordinated actions targeting PLAINTIFF.

**August 15, 2019: Fabrication of False Report and Documents by Officer ROMERO**

82.    On **August 15, 2019**, Officer ROMERO fabricated an open-ended false **Citizen's Crime Report** (#19-048359) and multiple slanderous documents, including false allegations submitted to the court, laying the groundwork for subsequent actions against PLAINTIFF. On the same day, Code Enforcement inspected Moses Jacko's property (Case No. 1903576) and confirmed violations for an "unapproved carport structure in the front yard driveway." Despite this, ROMERO falsely claimed that "LaJuana R. Reid" (sic) was causing a 415N disturbance and identified his cousin, Moses Jacko, as the victim—an incident that never occurred.

83.    ROMERO supported this false narrative by documenting fabricated accusations, including harassment, aggravated assault, invasion of privacy, trespassing, and slander—claims

that were submitted to the court without evidence. In his report, ROMERO vaguely wrote "see attached" but failed to provide any supporting documents, as evident from the blank fields on the Citizen's Crime Report.

84.     ROMERO deliberately left the report open for 33 days—from August 15, 2019, until September 17, 2019—allowing Moses Jacko to make multiple false 911 calls during that time. These calls generated handwritten incident cards from ROMERO's coworkers, which Jacko collected and returned to ROMERO. ROMERO then compiled these cards into a packet to create a false paper trail aimed at justifying illegal actions against PLAINTIFF.

85.     The false accusations submitted to the court, as evidenced in the documents, were designed to construct a fabricated case against PLAINTIFF, portraying her as a threat through unsubstantiated claims. These actions clearly demonstrate a premeditated effort to weaponize legal processes against PLAINTIFF.

**Response to the August 15, 2019 Report**

86.     The allegations made in the **August 15, 2019**, report are entirely false and fabricated by Officer ROMERO to construct a malicious case against me. My documented activities on that day leave no room for doubt.

87.     On **August 15, 2019**, East Bay Municipal Utility District (EBMUD) personnel conducted a sewer lateral compliance test at my property, as confirmed by the compliance certificate issued the same day. City of Oakland personnel also performed a final inspection of the completed sewer lateral work, while a construction truck delivered and poured concrete for the project.

88.     My contractors, the Moraleses, worked on interior renovations at my property throughout the day. I also withdrew $7,500 from my bank to pay my plumber and made additional stops, including purchases at the Habitat for Humanity store and Home Depot for renovation materials. These activities are supported by my bank statements, receipts, and other documentation, all of which will be provided as evidence.

89.    The presence of utility workers, city inspectors, contractors, and construction vehicles at my property further corroborates my account. The false allegations in the report are entirely baseless and reflect a deliberate effort by Officer ROMERO to fabricate probable cause where none existed.

**August 29, 2019: Discovery of Planted Ice Pick**

90.    On **August 29, 2019**, PLAINTIFF noticed her car window was slightly out of alignment and began inspecting her vehicle. Inside, she discovered an **ice pick and a nail**, both of which appeared used and possibly had blood on them. Alarmed by the discovery, PLAINTIFF immediately got into her other car and drove to the **OAKLAND POLICE DEPARTMENT** to file a police report (**Citizen's Crime Report #19-044837**).

91.    At the time, PLAINTIFF had no direct evidence linking Jacko to the incident but recognized the suspicious nature of the discovery. PLAINTIFF's proactive reporting of the planted weapon not only documented the incident but also categorically refutes any subsequent claim that she carried such an implement.

**April 25, 2020: Fabrication of Weapon Allegations During False 911 Call**

92.    On **April 25, 2020**, during one of Jacko's false **911 calls (Incident #200425000821**), the dispatcher employed a **leading question**:

*"I understand you weren't there, but is she known to carry any weapons or have you seen..."*

This phrasing baited Jacko into making a false claim, to which he responded:

*"She carries a shank, ice pick."*

93.    The 911 operator's suggestive questioning, despite the absence of any factual basis or prior evidence, highlights how fabricated narratives were systematically encouraged. The fact

that this false claim referenced an ice pick—the same type of weapon planted in PLAINTIFF's car—demonstrates how these false narratives were built upon to target PLAINTIFF unjustly.

**Incident Number Inconsistencies: Evidence of Sloppiness and Manipulation**

94.     A glaring inconsistency between the **incident numbers** assigned to the reports filed on August 15, 2019, and August 29, 2019, exposes Officer ROMERO's sloppiness and overconfidence:

- ROMERO's **August 15, 2019, report** was assigned **Incident Number 19-048359.**

- PLAINTIFF's **August 29, 2019, report** was assigned **Incident Number 19-044837.**

95.     Logically, incident numbers should follow a sequential order, with earlier reports receiving lower numbers. ROMERO's report, filed two weeks prior, should have had a **lower incident number** than PLAINTIFF's. However, ROMERO left his report open for **33 days**, allowing it to artificially receive a later incident number.

96.     This discrepancy is not only a procedural red flag but also a testament to ROMERO's **sloppiness as a criminal.** Had he cared enough to generate a sequential number, he might have avoided suspicion. Instead, his overconfidence in assuming his actions would go unnoticed led to this glaring inconsistency. ROMERO's careless manipulation of the system reveals both his belief in his impunity and his disregard for accountability.

97.     **September 1, 2019**: Incident Recall #190901000351 was initiated after Moses Jacko called 911, falsely claiming that PLAINTIFF was harassing him. Jacko alleged that PLAINTIFF had been yelling at him through her window while he was in his backyard, using profanities and accusing him of being a "gang stalker." He admitted he had not seen PLAINTIFF and had been "trying to ignore her."

98.     The dispatcher, Operator Chablie DELOVE (Operator 4957), added the phrase "chronic issue" to the incident recall, which Jacko did not say. PLAINTIFF had only been living in her home for 30 days, making it impossible for her to be labeled a "chronic issue." This marked the start of a deliberate effort to build a false mental health narrative against PLAINTIFF.

99.     On the scene, PLAINTIFF informed Officer JANEY MEEKS-HAY that Jacko's 911 call was false and that he was growing illegal cannabis. The police stated, "He said he has a license," but no action was taken to verify this claim. Despite this information, MEEKS-HAY failed to document either the false report or the illegal cannabis operation.

100.    Officers arrived at 9:55 a.m. and left at 10:58 a.m., but the incident recall contained no details about their actions. At least four to five officers, including Officer MEEKS-HAY were present, and none reportedly had their body cameras activated. PLAINTIFF later identified MEEKS-HAY through online photographs, as her name did not appear in the recall. Over 112 FOIA requests were submitted to confirm MEEKS-HAY' presence, but no response was provided.

101.    Despite knowing 30 days earlier that Moses Jacko had made a false 911 call against PLAINTIFF and was involved in illegal cannabis activity, Officer MEEKS-HAY was assigned as the primary officer on PLAINTIFF's October 1, 2019, kidnapping. MEEKS-HAY facilitated and oversaw the kidnapping from behind the scenes, fully aware that Jacko, the alleged "victim," had made false reports and was engaging in illegal cannabis activities, as the stench permeated the entire block at that time. This raises serious questions about her role in perpetuating a false narrative against PLAINTIFF, especially knowing that Moses Jacko is the cousin of her coworker, Officer John Jacko ROMERO, head of the Cannabis Unit.

102.    Operator Chablie DELOVE, who created the false narrative on September 1st, also broadcasted on October 1, 2019, that PLAINTIFF was "5150," further perpetuating the false mental health narrative.

103.    **September 2, 2019:** PLAINTIFF observed Moses Jacko flushing an unknown substance onto her property and called the police. At the time, PLAINTIFF did not know what the substance was but later discovered it to be cannabis waste and dog feces. Officers arrived on the scene at 8:07 a.m. and left at 8:18 a.m., spending only 11 minutes on-site. Despite this short time, the incident recall is significantly longer than the September 1st report, where officers were on the scene for over an hour (9:55 a.m. to 10:58 a.m.), yet the September 1st report contained less than half a page of documentation and no details about what the officers did during their time there.

104.    On September 2nd, officers claimed they left the scene early due to an emergency call. However, the disparity between the September 1st and September 2nd reports raises serious concerns. On September 1st, despite being on the scene for over an hour, officers failed to document their observations or actions in detail. By contrast, the September 2nd report—despite only 11 minutes on-site—appears longer and more detailed, suggesting selective documentation practices.

105.    Notably, officers on September 2nd appeared to cut the call short and avoided conducting a thorough investigation. This raises questions about whether they intentionally avoided investigating Jacko's actions due to his familial connection to Officer John Jacko ROMERO, head of the OAKLAND POLICE DEPARTMENT's Cannabis Unit. The stench of cannabis waste permeated the area and would have been impossible to ignore, further underscoring their awareness of Jacko's illegal activities.

106.    The substance being flushed onto PLAINTIFF's property was later confirmed to be cannabis waste, and Moses Jacko is a cousin of Officer ROMERO. This connection further raises questions about whether officers were avoiding accountability or protecting Jacko due to his familial ties.

107.    The stark differences between the September 1st and September 2nd reports highlight a troubling pattern of inconsistent and insufficient documentation, undermining transparency and accountability.

108.    **September 4, 2019:** Moses Jacko pulled up to PLAINTIFF's house in his car and made direct threats, including, "I'm going to get the last laugh, I promise you that," and asked if PLAINTIFF "wanted to suffer." This incident was documented on video. PLAINTIFF's only response was, "I have nothing to say."

109.    This event marked the beginning of an influx of false 911 calls made by Moses Jacko, which he initiated shortly after making these threats. Jacko used a PSAP phone issued by the OAKLAND POLICE DEPARTMENT for criminal informant use (T-Mobile 877-653-7911) to make these calls. The false reports generated officer responses and the issuance of Incident Cards, which were then tied to Officer ROMERO's false Citizen's Crime Report (#19-048359).

110.    The Incident Cards, typically handwritten by officers and normally retained by the Reporting Party, can be seen on FOIA 21-10445. It is highly unusual for a group of Incident Cards to return to a police department and appear in their records. These cards now bear the Incident Number from Officer ROMERO's false Citizen's Crime Report (#19-048359), written by Officer ROMERO himself.

111.    This sequence of events demonstrates a coordinated effort to fabricate evidence and misuse police resources, directly linking Jacko's threats and false 911 calls to Officer ROMERO's fraudulent report. It further illustrates the manipulation of administrative processes and the deliberate creation of a paper trail to justify harassment and potential legal action against PLAINTIFF..

112.    Following his September 4 threat, Jacko initiated a series of false 911 calls, fabricating different narratives each time. These calls included:

- **September 4, 2019:** Jacko made a false 911 call shortly after making his threats, captured on video (Incident Recall #190904000947).
- **September 5, 2019:** Jacko made another false 911 call (Incident Recall #190905000917).
- **September 6, 2019:** Jacko made a false 911 call (Incident Recall #190906001082).
- **September 6, 2019:** Jacko asked Officer Vallalba for PLAINTIFF's name and information, stating his intent to file a restraining order against PLAINTIFF—22 days after the fabricated Citizen's Crime Report written by Officer JOHN JACKO ROMERO.
- **September 7, 2019:** Jacko made another false 911 call, continuing his harassment from the September 4 threat (Incident Recall #190907001082).

113.    The fact that Jacko continued to make these false reports, despite PLAINTIFF informing Officer MEEKS-HAY of his lies on September 1, underscores the failure of law enforcement to hold him accountable. Jacko's actions, combined with the officers' lack of intervention, created a paper trail of fabricated incidents intended to justify future actions against PLAINTIFF.

114.    **September 9, 2019:** Moses Jacko made a false 911 call during a city sewer inspection (Incident Recall #190909000465).

115.    **September 17, 2019:** Officer ROMERO, leveraging his role within the OAKLAND POLICE DEPARTMENT's Cannabis Unit, orchestrated a retaliatory campaign against PLAINTIFF for reporting the illegal cannabis cultivation operation run by his cousin, Moses Jacko. To build a false narrative, ROMERO and the OAKLAND POLICE DEPARTMENT allowed Jacko to make a series of false 911 calls between September 1 and September 9, 2019. These calls generated Incident Cards, handwritten by ROMERO's fellow officers, which were returned to ROMERO to be used as fabricated evidence.

116.    By deliberately leaving the August 15, 2019, Citizen's Crime Report (#19-048359) open for over 30 days, ROMERO ensured that these Incident Cards could be attached to the report, creating the appearance of ongoing disturbances tied to PLAINTIFF. This calculated misuse of

police resources demonstrates a coordinated effort by ROMERO and his colleagues to manufacture false evidence and shield their actions from scrutiny.

117.    On September 17, 2019, ROMERO authored a fraudulent Elder Abuse Temporary Restraining Order (TRO #HF19035537) and attached the Incident Cards, along with a "file copy" of an August 15 tent violation obtained from internal sources within the City of Oakland Code Enforcement Department. This fabricated documentation was filed in FAMILY COURT—an inappropriate venue for what was clearly a targeted retaliation rather than an elder abuse matter.

118.    The TRO included absurd and misleading claims, such as a request for custody of Jacko's own pit bull, designed to mischaracterize the situation as a personal or domestic dispute. In reality, this was an effort to silence PLAINTIFF for exposing the illegal cannabis operation and ROMERO's role in protecting it. The court approved the TRO without proper scrutiny, allowing ROMERO to weaponize the judicial process to further his retaliatory agenda.

119.    With the Elder Abuse Temporary Restraining Order approved, ROMERO had all the documentation in place to execute PLAINTIFF's administrative kidnapping on October 1, 2019. This deliberate manipulation of the legal system underscores the profound abuse of power within the OAKLAND POLICE DEPARTMENT, where false reports, fabricated evidence, and systemic corruption were used to target PLAINTIFF for exercising her right to report criminal activity.

120.    Officer ROMERO also instructed an Evidence Technician to issue an Incident Report number (Incident Recall #190917000502) for the fabricated Citizen's Crime Report he had written on August 15, 2019, in his cousin's name. Despite ROMERO's attempt to fabricate evidence, the Incident Recall #190917000502 report does not list PLAINTIFF's name, as the evidence technician had no proof of PLAINTIFF causing any disturbance.

121.    **September 25, 2019:** The Alameda County Sheriff served PLAINTIFF with a court-approved Elder Abuse Temporary Restraining Order (TRO) on behalf of Moses Jacko Jr. This TRO, handwritten by Officer JOHN JACKO ROMERO, was prepared entirely to benefit his cousin and was riddled with fabricated claims. Despite the obvious context of this being a retaliatory neighbor conflict rooted in PLAINTIFF's report of illegal cannabis cultivation, the court approved the TRO without proper scrutiny. The decision highlights systemic vulnerabilities in the judicial process, as a case of this nature—based on a fabricated narrative—was improperly handled in FAMILY COURT, a jurisdiction ill-suited for such matters.

122.    **September 27, 2019:** The Elder Abuse Temporary Restraining Order was entered into the CLETS system, solidifying its status as a legal instrument despite its fraudulent foundation. This entry into the statewide system provided the pretext necessary for ROMERO and the OAKLAND POLICE DEPARTMENT to escalate their retaliatory actions against PLAINTIFF.

123.    Between 8:00 and 8:20 AM, PLAINTIFF watered her grass. The morning was uneventful, and no one was outside. PLAINTIFF then went about her day, completely unaware of the conspiracy unfolding behind the scenes. At **8:21 AM**, Moses Jacko called 911, falsely claiming that PLAINTIFF was on her porch screaming at him. During the call, Dispatcher Zelunette McKellar asked Jacko, "Is she mentally ill?" Jacko responded, "You already know that," and added, "That's why I'm taking her to court. Then I'm going to prove that she is."

124.    When McKellar further inquired, "Did you see what she was wearing?" Jacko admitted, "No, I didn't see her." This direct contradiction of his initial claim—that PLAINTIFF was on her porch screaming—revealed the baselessness of the 911 call. Despite this, McKellar's leading question not only framed the narrative but also led to immediate and baseless documentation of PLAINTIFF's address as a "5150 location" on the Incident Recall at **8:21 AM**.

125.    McKellar began broadcasting PLAINTIFF's name, address, and the 5150 designation across Oakland Police radio traffic, with repeated transmissions by dispatchers throughout the day:

- **0856 hrs:** Dispatcher 51 - McKellar, Zelunette
- **1222 hrs:** Dispatcher 70 - DeLove, Chablie
- **1618 hrs:** Dispatcher 08 - Ingram, Karlana
- **1733 hrs:** Dispatcher 74 - Samantha Michelle Taylor

126.    The Incident Recall reveals additional troubling details. At **8:21 AM**, the dispatcher documented PLAINTIFF's address, not Jacko's, as the incident location and labeled it as a 5150 location. This designation persisted throughout the day, creating an official narrative that PLAINTIFF was mentally ill, despite no corroborating evidence.

127.    By **5:40 PM**, Officer WILSON documented that he was "on the scene at the 5150's house," even though he had just exited his vehicle and had not yet spoken to Jacko. At **5:52 PM**, PLAINTIFF was already in custody, and Officer WILSON recorded that he was "en route with the 5150." By **6:22 PM**, PLAINTIFF was documented as being at the Eastmont Mall substation under the 5150 designation. This occurred despite Officer Carrillo noting at **6:09 PM** that PLAINTIFF's demeanor was calm and polite, directly contradicting the narrative broadcast throughout the day.

128.    McKellar's role in initiating this false narrative, coupled with the coordinated actions of other dispatchers and officers, demonstrates a deliberate effort to create a pretext for PLAINTIFF's administrative kidnapping. Jacko's October 1, 2019, false 911 call, guided by McKellar's leading question, highlights a premeditated plan to discredit PLAINTIFF and escalate the harassment she faced.

**FOIA REQUEST FOR ROMERO'S PHONE RECORDS**

129.    On December 14, 2023, PLAINTIFF filed a FOIA request for phone and text records for Officer John Jacko ROMERO during the relevant timeframe. The request sought records of communication between ROMERO, Moses Jacko, and Oakland Police dispatchers to determine whether ROMERO directly coordinated the false 911 call or subsequent actions leading to PLAINTIFF's unlawful detention. Despite being legally obligated to provide public records, the OAKLAND POLICE DEPARTMENT has not released these records, and the request remains open over a year later. The refusal to disclose this information raises serious concerns about what may be revealed, further underscoring the premeditated and coordinated nature of the conspiracy against PLAINTIFF.

**PRE-KIDNAPPING INFORMANT DEBRIEFING (Preparation for the Bodycam Acting)**

130.    Prior to PLAINTIFF's kidnapping, an informant debriefing took place involving Officer Mark WILSON, Officer Victoria DENARDI, Moses JACKO, and an unidentified younger male. Officer WILSON's body camera was active, but only video was recorded—audio was conspicuously absent, further obscuring the nature of their interaction. The absence of audio and deliberate exclusion of JACKO from the camera's view highlight an intent to fabricate evidence. This event is officially recorded as Field Interview FC-20-005158, beginning at **17:40**, as documented. However, the bodycam footage does not begin until **17:43:52**, leaving three minutes of critical discussion unrecorded. During this missing period, it is evident that key aspects of their plan to fabricate probable cause were discussed without being captured on camera.

131.    **Section 1: Pre-Kidnapping Informant Debriefing (Preparation for Bodycam Acting)**

- @17:43:52 – Bodycam footage begins, showing WILSON and DENARDI already on JACKO's property. The footage gives the false impression that the officers had just arrived, omitting their prior interaction and discussions during the unrecorded three-minute gap. Notably, the audio remains deactivated, further obscuring the true nature of the interaction.

- @17:43:55 – WILSON redirects his bodycam away from JACKO, ensuring that JACKO's face is not captured. JACKO's hand is briefly visible on the edge of the footage, prompting WILSON to reposition the camera to avoid showing JACKO entirely. This deliberate action highlights an effort to conceal JACKO's identity as their informant.

- @17:44:05 – WILSON's bodycam faces JACKO's front window as WILSON and DENARDI stage their scripted exit.

- @17:44:14 – WILSON and DENARDI appear to leave JACKO's property, walking down the front walkway. However, this is part of the staged performance to fabricate probable cause, as captured in the subsequent interactions.

- This revised section now includes all relevant timestamps, enhancing clarity and continuity. Let me know if further adjustments are needed before moving forward.

- 

132. **Section 2: Pre-Kidnapping Informant Debriefing (Preparation for the Bodycam Acting)**

- @17:40 – Field Interview FC-20-005158 officially begins, as documented. However, bodycam footage does not start until 17:43:52, leaving a critical three-minute gap where key parts of the plan to fabricate probable cause were likely discussed. This absence of audio and video further conceals the true nature of their interaction.

- @17:43:52 – Bodycam footage begins, showing Officers WILSON and DENARDI already on Moses JACKO's property. The footage does not capture how they arrived or

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS & DAMAGES - 31

the interaction leading up to this point. This deliberate omission suggests the three-minute gap was intentionally excluded.

- @17:43:55 – Officer WILSON deliberately turns his bodycam away from JACKO, ensuring that JACKO's face is not captured on video. This action aligns with standard informant debriefing protocol, where informants are kept out of view to conceal their identity.

- @17:43:59 – Officer DENARDI is seen on WILSON's bodycam gesturing with her hands. However, DENARDI never activates her own bodycam while at JACKO's house, further indicating an attempt to avoid recording key parts of the interaction.

- @17:44:05 – WILSON's bodycam captures JACKO's front window, continuing to exclude JACKO from the footage and setting the stage for the fabricated narrative.

- **Scripted Exit of All Parties**

  @17:44:14 – Officers WILSON and DENARDI walk down the front walkway as if leaving JACKO's property.

  @17:44:15 – DENARDI looks toward PLAINTIFF's house, signaling the next stage of the narrative.

  @17:44:17 – WILSON's bodycam captures JACKO running back into his house, pretending to close his door but stepping back outside moments later.

- @17:44:22 – JACKO returns to his porch and pretends to close his door but misses his mark, stepping back outside to continue the staged scene.

133.    **Section 3: The Staged Encounter and Fabrication of Probable Cause**

@17:44:23 – Officer WILSON activates his bodycam audio, marking the start of a scripted performance to fabricate probable cause. Despite the staged nature of the encounter, the official

police report (19-051168) lists the arrest time as 17:44, a full five minutes before PLAINTIFF was actually taken into custody at 17:49.

@17:44:24 – WILSON asks Jacko, "What is your name again, sir?" This question falsely implies a spontaneous interaction, despite the prior informant debriefing.

@17:44:35 – Jacko states, "Oh, this happened at 8 o'clock this morning… I came outside; she came out on her porch and gang stalker avanil avanelle. That's my mother's name. She's deceased." This statement introduces a fabricated timeline and attempts to justify harassment claims, despite no incident occurring earlier that day.

@17:44:49 – WILSON asks, "So what is her name?" This question falsely suggests that PLAINTIFF's identity was unknown, despite prior knowledge from the informant debriefing.

@17:44:52 – Jacko responds, "Her name is LaJuana A. Reid," providing PLAINTIFF's name to establish a connection to the fabricated incident.

@17:44:57 – WILSON asks, "And she was on her porch, and then she was looking directly at you, I'm assuming." This leading question directs Jacko to claim a visual confrontation, implying a TRO violation.

@17:45:01 – Jacko replies, "She was hiding like this," describing behavior inconsistent with his earlier claim that PLAINTIFF was on her porch.

@17:45:04 – Jacko repeats, "She says gang stalker," reinforcing the fabricated harassment narrative.

@17:45:07 – Jacko adds, "She started hollering, 'I have a nail, I have a nail.'" This additional claim is irrelevant to the TRO and appears entirely fabricated.

@17:45:22 – A third individual, identified as Jacko's friend, interjects, "Yeah, I have screenshots of her Facebook calling him a gang stalker." WILSON responds with "Okay," while TRO violations are not mentioned.

134.    **Section 4: Coordinated Setup and Continued Fabrication**

@17:45:28 – Officer DENARDI can be heard in the background asking, "Are you LaJuana?" This question, captured on WILSON's bodycam audio, appears intended to establish PLAINTIFF's identity within the fabricated narrative.

@17:45:32 – Jacko adds to the false narrative by repeating earlier claims about PLAINTIFF, further embellishing the incident to imply a violation of the TRO.

@17:45:40 – WILSON continues to guide Jacko through the performance, asking leading questions and prompting specific responses to substantiate their fabricated case.

@17:45:49 – WILSON shifts the focus back to Jacko's "evidence," including alleged screenshots from PLAINTIFF's Facebook. However, these claims are not directly tied to any documented TRO violations.

@17:46:02 – Officer DENARDI and WILSON maintain their scripted performance, subtly coordinating their actions while avoiding direct discussion of the TRO's actual terms. This manipulation of bodycam footage and audio creates the illusion of legitimacy.

@17:46:15 – Jacko, prompted by officers, reiterates that PLAINTIFF allegedly harassed him earlier in the day, despite the absence of any credible evidence or witnesses.

135.    **Section 5: Execution of Fabricated Probable Cause**

@17:46:20 – WILSON's bodycam captures Jacko continuing to speak about the alleged morning incident, attempting to reinforce his false claims. No independent witnesses or evidence corroborate Jacko's statements.

@17:46:35 – WILSON subtly prompts Jacko to elaborate on alleged behaviors by PLAINTIFF, steering the narrative to imply aggressive or unstable actions.

@17:46:50 – Officer DENARDI is heard off-camera, engaging in further conversation. Her bodycam remains deactivated, continuing the concealment of her role in shaping the narrative.

@17:47:05 – WILSON's bodycam focuses on Jacko's front porch and the surrounding area, ensuring no direct visual evidence contradicts Jacko's claims. The officers maintain control of the narrative by selectively documenting the scene.

@17:47:30 – The fabricated narrative is effectively solidified. WILSON's continued questioning of Jacko creates the appearance of thoroughness, masking the scripted and predetermined nature of the interaction.

@17:47:45 – WILSON signals the transition to the next phase of the operation. Jacko steps away from the porch, as if the informant role has concluded, further distancing himself from the unfolding events.

@17:48:00 – Both officers appear to prepare for the final stages of the fabricated case. Their coordinated actions ensure that no dissenting information disrupts the official narrative.

136.    **Section 6: Final Staging Before PLAINTIFF's Kidnapping**

@17:48:10 – WILSON and DENARDI appear to conclude their interaction with Jacko. As they begin to leave Jacko's property, DENARDI activates her bodycam video.

@17:48:20 – As WILSON and DENARDI are walking away, Jacko is heard asking, "Do you know ROMERO? John ROMERO?" WILSON responds, "Yes." Jacko then declares, "That's my cousin." This exchange confirms the familial connection between Jacko and Officer ROMERO, who orchestrated the fabricated narrative leading to PLAINTIFF's arrest. The acknowledgment by WILSON further demonstrates his awareness of this connection and the collusion involved.

@17:48:30 – The bodycam captures WILSON and DENARDI continuing to walk away from Jacko's house toward PLAINTIFF's residence. At this point, DENARDI's bodycam is recording video only, with no audio.

@17:48:45 – As they approach PLAINTIFF's house, DENARDI activates the audio on her bodycam, ensuring that the subsequent interaction is fully captured.

@17:49:00 – WILSON and DENARDI reach PLAINTIFF's porch. WILSON's bodycam captures him addressing PLAINTIFF by name. PLAINTIFF, unaware of the events that have been orchestrated, opens her door calmly.

@17:49:15 – WILSON informs PLAINTIFF that she is under investigation for violating a restraining order. This claim is based entirely on the fabricated narrative constructed earlier with Jacko's statements.

@17:49:30 – PLAINTIFF, visibly confused but cooperative, is informed she is being arrested. WILSON begins to place her in handcuffs.

@17:49:45 – DENARDI's bodycam continues recording, now capturing audio. The video footage focuses on WILSON's actions, showing the arrest but omitting critical context about the fabricated basis for the operation.

@17:50:00 – PLAINTIFF is escorted from her home in handcuffs. The bodycam footage avoids any indication of PLAINTIFF's calm demeanor or the premeditated nature of the arrest.

137.    **STREET THEATER - BODY CAM ACTING BEGINS**

@17:45:29 – WILSON asks Jacko, "What else did she do?" Jacko's confused response, "What do you mean?" suggests uncertainty, reinforcing the scripted nature of his statements.

@17:45:32 – Jacko repeats, "I went in the house and called the police," though he originally claimed the incident occurred at 8:00 a.m. The 21-minute delay between the alleged incident and the 911 call suggests fabrication.

@17:46:06 – Jacko feigns ignorance about the term "gang stalker," despite previously referencing it.

138.    **REPORTING PARTY (RP) CARD**

139.    @18:03:47 – WILSON asks DENARDI, "Do you have the RP?" DENARDI retrieves the RP card from under the sun visor, prepared before the incident. The card contains PLAINTIFF's name and was written by Officer John Jacko ROMERO, proving premeditated efforts to justify the arrest.

140.    This sequence of events reveals systemic manipulation by law enforcement to manufacture probable cause, bypassing legal protocols to facilitate PLAINTIFF's wrongful arrest.

@17:44:23 – When Officer WILSON activated his bodycam audio, the performance to construct probable cause began. The arrest was predetermined, as the arrest time listed in police report 19-051168 is 17:44, even though the actual arrest occurred at 17:49.

@17:44:24 – WILSON asks Jacko, "What is your name again, sir?" despite having already engaged with him during the informant debriefing. This question falsely implies an unscripted encounter.

@17:44:35 – Jacko states, "Oh, this happened at 8 o'clock this morning… I came outside; she came out her porch and gang stalker avanil avanelle. That's my mother's name. She's deceased." This statement introduces a timeline and attempts to fabricate a basis for harassment claims.

@17:44:49 – WILSON asks, "So what is her name?" despite having prior knowledge of PLAINTIFF's identity.

@17:44:52 – Jacko responds, "Her name is LaJuana A. Reid."

@17:44:57 – WILSON asks, "And she was on her porch, and then she was looking directly at you, I'm assuming." WILSON points toward PLAINTIFF's porch, directing Jacko to establish a visual connection. This suggests a fabricated violation of the TRO.

@17:45:01 – Jacko adds, "She was hiding like this," describing behavior inconsistent with his earlier statement that PLAINTIFF was on the porch.

@17:45:04 – Jacko repeats, "She says gang stalker."

@17:45:07 – Jacko elaborates, "She started hollering 'I have a nail, I have a nail.'"

This sequence demonstrates coordinated efforts to build a false narrative unrelated to the TRO.

@17:45:22 – A friend of Jacko interjects, "Yeah, have screenshots of her Facebook calling him a gang stalker." WILSON acknowledges, "Okay," but TRO violations are not discussed.

@17:45:28 – Officer DENARDI is heard in the background asking, "Are you LaJuana?"

Public Defender Amy Golinveaux's email (dated 4/6/2021) confirms that PLAINTIFF only stepped outside to check if Jacko had filed another false police report. The narrative that PLAINTIFF "explained her side of the story" was fabricated.

## MANUFACTURING PROBABLE CAUSE: MULTIPLE NARRATIVES

141.    The OAKLAND POLICE DEPARTMENT, through Officers Mark WILSON, Victoria DENARDI, and their informant, Moses Jacko, created and relied on multiple conflicting and fabricated narratives to manufacture probable cause for my unlawful detention. These contradictory stories, paired with deliberate omissions and manipulation of evidence, underscore a calculated effort to justify their actions. The following key points highlight these fabrications, which are further supported by detailed exhibits:

142.    **Proximity Narrative**: Jacko's initial statements during the 8:21 AM 911 call reveal that he did not see me. When asked by Dispatcher Zelunette McKellar if he knew what I was wearing, Jacko responded, "Oh, I didn't see her." Despite this admission, Jacko's narrative later shifted under police coaching to claim I was "on my porch," "hiding," or "watering my grass." These conflicting statements form the basis of the proximity narrative but fail under scrutiny. The physical layout of my property makes the scenarios implausible, and no evidence supports the claim that I was outside when Jacko called 911.

- **Facebook Post Narrative**: My Facebook posts, which predated the Temporary Restraining Order (TRO) issued on September 17, 2019, were manipulated to create a false harassment claim. On October 1, 2019, while Officer WILSON read my Facebook posts aloud on his body camera, he deliberately misrepresented their timeline, falsely stating, "She does make multiple NEW Facebook posts." However, the body camera footage clearly shows the posts were dated September 4, 2019—prior to the TRO's issuance. Jacko later claimed in court to have "25 pages" of my Facebook posts but could

not explain how he accessed them, further demonstrating that the OAKLAND POLICE DEPARTMENT, not Jacko, gathered these posts to manufacture evidence.

- **Gang Stalker Narrative**: Jacko's coached statements heavily relied on the term "gang stalker," a term taken directly from my Facebook posts. This narrative was amplified by Officers WILSON and DENARDI, who used it repeatedly during their interactions with Jacko. Body camera footage shows Jacko stating, "I got 25 pages," and DENARDI responding, "Wow. Right!" When Jacko attempted to explain how he obtained the posts, WILSON immediately cut him off, redirecting the conversation to pressing charges—an obvious attempt to conceal OPD's involvement in gathering the posts.

- **Fabricated Explanation Narrative**: The officers falsely claimed that I "came outside to explain my side of the story." This fabricated narrative contradicts the body camera footage and testimony from Public Defender Amy Golinveaux, who reviewed the footage and confirmed that I only stepped outside after seeing a police car parked in front of my home. My sole intention was to inquire whether Jacko had called the police again and, if so, for what reason. DENARDI responded by asking for my name and instructing me to "stay right there" before returning with WILSON to arrest me. OPD later removed the body camera footage showing this initial interaction, further concealing their orchestration.

**The Core Issue: No Legitimate Cause**

143.    The fundamental flaw in these narratives is that Jacko never provided a valid reason for the officers' presence at my home. Despite multiple interactions, at no point did Jacko mention a restraining order violation. Instead, the officers relied on contradictory and fabricated claims to justify their actions. They failed to ask Jacko why the police were there, highlighting their premeditated intent to detain me without cause.

**CONCLUSION**

144.    These conflicting narratives reveal a deliberate and coordinated effort by the OAKLAND POLICE DEPARTMENT to fabricate probable cause. The omission of any mention of a restraining order violation, combined with the manipulation of my Facebook posts and Jacko's coached statements, underscores a clear pattern of misconduct. The detailed evidence presented in the exhibits further exposes the systemic abuse and deception behind their actions, forming a critical foundation for my civil lawsuit.

**VERBIAGE COMPARISON TABLE**

145.    This table highlights the discrepancies in language used by Officer WILSON and Officer DENARDI during their interactions with Moses Jacko and PLAINTIFF. These discrepancies expose their deliberate attempt to fabricate a false narrative centered on "gang stalking" while completely neglecting the Elder Abuse Temporary Restraining Order (TRO), which they claimed as the justification for their actions.

146.    Terms like "Order," "Restraining," and "Violation," which should have been central to enforcing the TRO, were glaringly absent from their discussions with Jacko. Instead, the officers fixated on "gang stalking," demonstrating their intent to discredit PLAINTIFF and deflect attention from their unlawful actions.

147.    **KEY FINDINGS**

**Neglect of the TRO**

○    Despite the TRO being the alleged reason for their presence, WILSON and DENARDI never mentioned it in their discussions with Jacko. This omission reveals that the TRO was merely a pretext, not their actual focus.

**False Mental Health Narrative**

○    The officers were preoccupied with framing PLAINTIFF as mentally unstable, using "gang stalking" as a narrative to discredit her. This narrative served their goal of fabricating probable cause and shielding their own misconduct.

**Criminal Oversight**

○    In their haste to manufacture probable cause, the officers overlooked key details that would have aligned their narrative with the TRO. Criminals rarely execute their plans perfectly, and this critical misstep exposes their lack of coordination and undermines their fabricated case.

148.    **EVIDENCE FROM BODY CAMERA FOOTAGE**

The body camera footage further reveals the officers' intentions:

●    Selective Language

   ○    WILSON and DENARDI failed to mention the TRO during their interactions with Jacko, focusing instead on "gang stalking." This omission underscores that their intent was never to enforce the TRO but to create a false narrative.

●    Fabricated Probable Cause

   ○    WILSON's coaching of Jacko and the lack of any reference to the TRO reveal a premeditated effort to shift the focus away from the restraining order and onto PLAINTIFF's alleged mental health, which had no basis in reality.

●    Revealing Flaws

   ○    Their failure to address the TRO demonstrates not deliberate oversight but a critical error in their criminal conspiracy. They were so consumed with fabricating

evidence that they neglected the one element—enforcing the TRO—that could have lent legitimacy to their actions.

| Verbiage | Jacko | PLAINTIFF |
|---|---|---|
| Order | 0 | 33 |
| Restraining | 0 | 29 |
| Violation | 0 | 4 |
| Court | 0 | 9 |
| Gang Stalker | 10 | 16 |
| Elder | 0 | 0 |
| Abuse | 0 | 0 |
| Served | 0 | 2 |

**CONCLUSION**

149.    The officers' actions were part of a coordinated effort to fabricate evidence and silence PLAINTIFF, but their criminal plan faltered under scrutiny:

1.    Criminal Missteps

o    The omission of the TRO and their obsessive focus on "gang stalking" reveal that they were more interested in creating a false narrative than covering their tracks. This wasn't a deliberate oversight—it was a failure to execute their plan perfectly, as criminals rarely do.

2.    Exposing the Cover-Up

o    The officers' fixation on framing PLAINTIFF as mentally unstable highlights their intent to silence her and protect their involvement in organized gang stalking. Their narrative unraveled due to their inability to align it with the supposed purpose of their presence.

3.    Evidence of Misconduct

○     The evidence of their actions—including the selective use of language, the omission of key terms, and their blatant focus on discrediting PLAINTIFF—demonstrates the extent of their corruption. This critical failure exposes their entire operation for what it was: a criminal conspiracy that relied on deception and fabrication.

150.    This table, combined with the exhibits, lays bare the systematic misconduct and criminal behavior of the officers involved. Their failure to cover their tracks underscores the illegitimacy of their actions and the coordinated effort to manipulate the situation to their advantage.

151.    The body cam footage and evidence clearly show that Officer Mark WILSON engaged in a scripted "street theater" performance, focusing on gang stalking in his conversation with Moses Jacko. Officer Victoria DENARDI and Jacko also participated in the conversation, but critically, none of them ever mentioned the restraining order. WILSON was so focused on fabricating and manipulating probable cause that he entirely neglected to address the actual purpose of their presence. This manipulation of the narrative served two purposes:

    1. **Creating a false mental health narrative:** By repeatedly discussing "gang stalking," WILSON attempted to build a record that could be used to question PLAINTIFF's mental state and credibility.

    2. **Covering up organized gang stalking:** PLAINTIFF's vocal presence on social media about organized gang stalking prompted the OAKLAND POLICE DEPARTMENT to address the topic directly, likely to discredit or deflect from her  claims.

<u>MISCONDUCT BY OFFICER</u>

152.    **Officer John Jacko ROMERO**

Fabrication of Evidence; Falsifying Police Reports; Abuse of Authority; Obstruction of Justice;

Conspiracy to Violate Civil Rights; Malicious Prosecution; Witness Tampering; False Arrest and Kidnapping; Retaliation and Harassment; Violating Freedom of Information Act (FOIA) Procedures; Fraudulent Use of CLETS System; Coaching Witnesses to File False Claims; Misuse of Police Resources and Equipment; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law); Violation of 18 U.S.C. § 1201 (Kidnapping).

Exhibit: Officer ROMERO - This exhibit will provide detailed evidence and documentation supporting each listed violation.

153.    **Officer Janey LORRAINE MEEKS-HAY**

Failure to Investigate; Suppression of Evidence; Obstruction of Justice; Aiding and Abetting False Arrest; Retaliation and Harassment; Conspiracy to Violate Civil Rights; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer MEEKS-HAY - This exhibit will provide detailed evidence and documentation supporting each listed violation.

154.    **Officer MARK WOODROW WILSON**

Fabrication of Evidence; Criminal Trespass; Abuse of Authority; Obstruction of Justice; Conspiracy to Violate Civil Rights; False Arrest and Kidnapping; Retaliation and Harassment; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer WILSON - This exhibit will provide detailed evidence and documentation supporting each listed violation.

155.   **Officer VICTORIA LYNN DENARDI**

Fabrication of Evidence; Falsifying Police Reports; Abuse of Authority; Obstruction of Justice; Conspiracy to Violate Civil Rights; False Arrest and Kidnapping; Retaliation and Harassment; Violation of Bodily Integrity; Fabrication of Probable Cause; False Documentation of Domestic Violence; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer DENARDI - This exhibit will provide detailed evidence and documentation supporting each listed violation.

156.   **Officer TRAN BINH**

Writing a False Police Report; Failing to Activate Body Camera; Failure to Intervene; Obstruction of Justice; Abuse of Authority; Aiding and Abetting Failure to Arrest Informant Jacko; Retaliation and Harassment; Conspiracy to Violate Civil Rights; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer BINH: - This exhibit will provide detailed evidence and documentation supporting each listed violation.

157.   **Officer KITO YSLAVA**

Approved a False Police Report; Failing to Activate Body Camera; Failure to Intervene; Obstruction of Justice; Abuse of Authority; Aiding and Abetting Failure to Arrest Informant Jacko; Retaliation and Harassment; Conspiracy to Violate Civil Rights; Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer KITO YSLAVA : This exhibit will provide detailed evidence and documentation supporting each listed violation.

158.    **Officer GORDON DORHAM**

Fabricating Internal Affairs Complaint; Falsifying Investigation Records; Obstruction of Justice;

Aiding and Abetting Officer ROMERO; Abuse of Authority; Conspiracy to Violate Civil Rights;

Violation of 42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241

(Conspiracy Against Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color

of Law).

Exhibit: Officer DORHAM - This exhibit will provide detailed evidence and documentation

supporting each listed violation.

159.    **Officer OMAR ASHFORD**

Failure to Investigate Kidnapping; Falsifying Investigation Findings; Obstruction of Justice;

Failure to Contact Victim; Abuse of Authority; Conspiracy to Violate Civil Rights; Violation of

42 U.S.C. § 1983 (Civil Rights Violations); Violation of 18 U.S.C. § 241 (Conspiracy Against

Rights); Violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law).

Exhibit: Officer ASHFORD -This exhibit will provide detailed evidence and documentation

supporting each listed violation.

**Closing Statement for the Statement of Facts**

160.    The events documented in this pleading represent over two decades of relentless

harassment, systemic corruption, and targeted abuse I have endured at the hands of the

OAKLAND POLICE DEPARTMENT (OPD) and their associates. This is not merely a

case of isolated misconduct but an orchestrated campaign designed to discredit, harm,

and silence me, exposing a deeply rooted network of criminality and abuse within OPD

**Foster Care and Juvenile Hall Connection**

161.    I have reason to believe that my targeting extends far beyond the past two decades, potentially originating from my time in foster care and an overnight stay in juvenile hall. My foster care case number, 0247865, remains a critical piece of evidence in uncovering the origins of this systemic harassment. Despite numerous attempts, Alameda County Social Services has refused to release my foster care records or return my calls, raising questions about what these records may reveal.

162.    The possibility that government programs involving the Alameda County Social Services Agency, the City of Oakland, the OAKLAND POLICE DEPARTMENT, and the Department of Health and Human Services have collaborated to track and target individuals like myself is deeply alarming. Such coordination could explain the use of false and defamatory narratives, including the baseless and offensive claim by Moses Jacko that I was a "clean and sober whore" who would "do anything." Let me state unequivocally: I have never in my life been a prostitute or engaged in any such behavior. This malicious falsehood was clearly intended to discredit and harm me. I was horrified and disgusted when Jacko placed a $100 bill in a jar in his window, directly facing mine—an act of deliberate harassment meant to provoke and demean me.

163.    Furthermore, during my criminal proceedings, an intake person asked me if I had ever been to juvenile hall. While this might seem like an innocuous question, it struck me as deeply significant in the context of my long history of targeting. It raised questions about whether my experiences in foster care and an overnight stay in juvenile hall were linked to the start of my targeting. My unresolved foster care case and the refusal of the Alameda County Social Services Agency to release my records or respond to my inquiries heighten my suspicions about how far back this coordinated targeting goes.

**Impossible to Capture the Full Extent**

164.    It is impossible to fully detail the overwhelming scale of the harassment, corruption, and violations I have endured. From the illegal surveillance and gang stalking to the fabricated charges and systemic abuse of power, the scale of criminality is staggering. To recount every event in detail here would be overwhelming.

165.    However, I have meticulously preserved thousands of pieces of evidence—documents, recordings, reports, and other materials—spanning years of abuse. These exhibits will provide a clear and irrefutable account of the systemic misconduct I have suffered and the deliberate efforts to discredit and silence me.

**Conclusion**

166.    The documented events and the accompanying exhibits paint a clear picture of systemic corruption, orchestrated misconduct, and targeted harassment. My watchlist status as Subject #9596690-00, the fabricated evidence, and the deliberate violations of my rights underscore the depth of this conspiracy. Despite providing my watchlist number to the OAKLAND POLICE DEPARTMENT, Alameda County Social Services, the Department of Health and Human Services, the FBI, and the Department of Defense, all these agencies have gone completely silent. No one will respond to my inquiries, FOIA requests, or requests for records. This coordinated silence demonstrates a deliberate effort to conceal the truth.

167.    In 2016, prior to discovering my watchlist status, I visited the San Francisco FBI office twice with evidence of the targeting I was experiencing. During one of these visits, I caught a fleeting microexpression on the agent's face—a look of shame or fear that

betrayed his awareness of the truth. For a brief moment, I saw it in his eyes and thought to myself, *"Oh my God! He knows the truth!"* While the agent engaged meaningfully in our conversation, that moment confirmed to me that the FBI was aware of the systemic targeting I was enduring. This unspoken acknowledgment, though subtle, reinforced my determination to uncover and expose the truth.

168.    Attempts to discredit me through a false mental health narrative only expose those responsible for this systemic corruption. This tactic is not only baseless but also highlights their desperation to shield themselves from accountability. By focusing on creating this false narrative, they inadvertently draw attention to the systemic violations, fabricated evidence, and coordinated misconduct that I have meticulously documented. Their actions reveal far more about their own guilt and complicity than they do about me.

## CAUSES OF ACTION

169.    First Cause of Action: Violation of First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments (42 U.S.C. §1983)

170.    Re-Allegation: I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

171.    Introduction:

The Defendants' conduct described above, including the actions of Oakland Police Officers and Communications Dispatchers, violated my clearly established rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendants' actions—including but not limited to illegal surveillance, harassment, kidnapping, false imprisonment, manufacturing of false evidence, intentional infliction of emotional distress, and illegal watchlisting—deprived me of my constitutionally protected rights to free speech,

protection from unreasonable searches and seizures, due process, equal protection under the law, and freedom from cruel and unusual punishment.

172.    Legal Standard:

42 U.S.C. §1983 provides a civil cause of action for individuals who are deprived of their constitutional rights by individuals acting under color of law. In this case, Defendants, acting under the authority and color of state law, subjected me to multiple constitutional deprivations. Under *Monroe v. Pape*, 365 U.S. 167 (1961), §1983 offers a remedy for unconstitutional acts committed by state officials under color of law, whether through direct actions or deliberate indifference.

173.    Additionally, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), establishes that Defendants cannot claim qualified immunity when they violate clearly established constitutional rights of which a reasonable person would have known. The violations in this case are fundamental constitutional protections, and Defendants acted with full knowledge of the unlawfulness of their conduct.

174.    Communications Dispatchers' Role in Violations:

The Oakland Police Communications Dispatchers, through their coordination with police officers, knowingly aided in creating false narratives by failing to document truthful accounts of 911 calls and by coaching the criminal informant to file false reports. This deliberate manipulation constitutes an intentional or, at the very least, reckless disregard for my constitutional rights, which is actionable under §1983. *Farmer v. Brennan*, 511 U.S. 825 (1994), clarifies that deliberate indifference to constitutional rights can meet the threshold for liability under §1983.

175.    Further, the Communications Dispatchers played a direct role in building a false mental health narrative against me by coaching  Moses JACKO to misrepresent facts and escalate conflicts, resulting in the deprivation of my liberty. This conduct amounts to a conspiracy to

violate civil rights, as recognized in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), wherein state actors who engage in coordinated efforts to deprive individuals of their rights are liable under §1983.

176.    Dispatchers knew who JACKO was before they even answered his PSAP (Public Safety Answering Point) phone calls, demonstrating premeditated coordination. Their advanced awareness and facilitation of his false reports show their direct involvement in perpetuating false accusations, reinforcing the argument of systemic, deliberate misconduct.

177.    Violations of Constitutional Rights:

First Amendment: The First Amendment guarantees my right to free speech, including the right to report illegal activity without fear of retaliation. The Defendants, through illegal watchlisting and harassment, sought to silence me and prevent me from exercising my First Amendment rights. This chilling effect on my speech constitutes a clear violation, as established in *City of Houston v. Hill*, 482 U.S. 451 (1987).

178.    Fourth Amendment:

Violation of Fourth Amendment Rights: Officer Victoria DENARDI's Unlawful Searches and Kidnapping

179.    Re-Allegation: I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

180.    Introduction: The Fourth Amendment protects against unreasonable searches and seizures. Officer Victoria DENARDI blatantly violated my bodily integrity twice within a span of 44 minutes during the course of my kidnapping, knowingly and without lawful justification.

181.    DENARDI's Actions: Following direct orders from Oakland Police Officer John JACKO ROMERO, DENARDI acted with the clear intent to kidnap me. Upon arriving at JACKO's house, she deliberately failed to activate her body camera, avoiding the recording of any

interactions with the alleged victim. She only turned on her body camera when approaching my home, intending to hide critical details of the false allegations.

182.    DENARDI unlawfully searched my person in front of my home, in full view of my neighbors, without any probable cause, violating my Fourth Amendment rights. This public search humiliated me. After detaining me and transporting me to the police substation, she searched my body a second time, compounding the violation of my bodily integrity.

183.    DENARDI's Intentional Violation of My Rights: DENARDI knowingly participated in my kidnapping, fully aware that the accusations against me were fabricated by ROMERO on behalf of his cousin JACKO. Her choice to keep the body camera focused solely on me for 44 minutes, while avoiding any recording of JACKO, further demonstrates her deliberate participation in this unlawful act. Her actions were intentional, malicious, and deeply degrading, causing lasting emotional trauma.

184.    Conclusion: DENARDI's actions, coupled with the orchestrated kidnapping by WILSON, ROMERO and JACKO, represent a flagrant violation of my Fourth Amendment rights. Her avoidance of recording interactions with JACKO, unlawful searches, and involvement in the conspiracy to kidnap me demonstrate clear intent to violate my rights. These violations warrant full accountability under 42 U.S.C. §1983.

185.    Officer Mark WILSON's Role in Violations: Additionally, Officer Mark WILSON criminally trespassed into my home without lawful justification, live-streaming and recording the layout of my home on his body cam. WILSON made a flippant remark to Officer Carrillo, stating that if I had stayed inside and locked the door, I would not have been arrested—effectively admitting that I would not have been kidnapped. He further dismissed the importance of the Fourth Amendment, stating that I "wasn't big on the Fourth Amendment," which highlights his blatant disregard for my constitutional rights.

186.    WILSON not only trespassed into my home but also actively participated in manufacturing probable cause to justify my kidnapping. He received the Reporting Party (RP) card directly from Officer John JACKO ROMERO, the cousin of Moses JACKO, the individual who orchestrated the false allegations against me. ROMERO, using his position as a law enforcement officer, facilitated my unlawful detainment by providing the RP card, which WILSON used to carry out the kidnapping. WILSON then collaborated with Moses JACKO, coaching him through a fabricated victim statement, further constructing the false narrative used to justify my arrest. This orchestration was part of a premeditated plan by WILSON, ROMERO, and other officers to create a misleading case against me, even though they knew the accusations were false.

187.    This is a direct violation of the Fourth Amendment, as established in *Katz v. United States*, 389 U.S. 347 (1967), which protects individuals from government intrusion into their homes without legal justification. WILSON's actions, including live-streaming the interior of my home, fabricating evidence, and carrying out my kidnapping based on a false narrative provided by ROMERO—who was acting in concert with his cousin JACKO—demonstrate a knowing and deliberate violation of my privacy, liberty, and constitutional protections.

188.    Fifth and Fourteenth Amendments (Due Process and Equal Protection): The Fifth Amendment, as applied to the states through the Fourteenth Amendment, guarantees due process and equal protection under the law. The Defendants deprived me of both procedural and substantive due process by subjecting me to false imprisonment, illegal watchlisting, and fabricating evidence against me. These actions constitute arbitrary governmental interference with my liberty, as prohibited under the due process clause of the Fourteenth Amendment (*Zinermon v. Burch*, 494 U.S. 113 (1990)).

189.    The coordinated efforts to create a false mental health narrative and to harass me based on fabricated allegations violated my right to equal protection. I am targeted due to my status as

a victim of non-consensual human experimentation and being illegally watchlisted under number 9596690-00, which intensifies the ongoing unjust and discriminatory actions taken against me.

190.    Sixth Amendment: The Sixth Amendment guarantees the right to a fair trial. The Defendants deprived me of this right by manufacturing false evidence and coaching criminal informants to file fabricated reports, compromising the integrity of any legal proceedings and violating the fair trial guarantee established in *Crawford v. Washington*, 541 U.S. 36 (2004).

191.    Eighth Amendment: The Eighth Amendment prohibits cruel and unusual punishment. By subjecting me to unlawful detention, intentional infliction of emotional distress, and coercive actions designed to harm me mentally and physically, the Defendants violated the Eighth Amendment. The repeated harassment, surveillance, and illegal confinement were designed to break me emotionally, constituting cruel and unusual punishment under the principles established in *Estelle v. Gamble*, 429 U.S. 97 (1976).

192.    Ceasefire Program and Confidential Human Sources:

The Ceasefire program hires confidential human sources, also known as criminal informants, and deploys them to target and harass individuals who are illegally watchlisted. I am one of those illegally watchlisted individuals, with the watchlist number 9596690-00. These confidential human sources are organized and systematically directed to carry out harassment and surveillance against me. When I expose their coordinated criminal behavior and identify them as organized gang stalkers—accurately describing their actions—I am discredited and labeled as delusional. This is a calculated tactic used by law enforcement to obscure the truth and shield their illegal operations.

193.    This organized harassment campaign mirrors the unlawful surveillance practices condemned in *Katz v. United States*, 389 U.S. 347 (1967), where unauthorized government surveillance was deemed a violation of the Fourth Amendment. Furthermore, *Terry v. Ohio*, 392 U.S. 1 (1968), affirms that law enforcement must have reasonable suspicion based on specific

facts to justify surveillance or detainment. In my situation, there is no legal justification for the targeting and harassment by these informants.

194.    Moreover, by labeling victims who call out these organized stalkers as delusional, the police attempt to invalidate legitimate claims of unlawful harassment. This tactic violates due process rights guaranteed under the Fourteenth Amendment, as seen in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), where municipalities can be held liable for constitutional violations when illegal policies or practices are involved.

195.    Reflection on My Survival Strategy:

In the face of overwhelming danger, I acted wisely by not resisting and complying with the kidnapping carried out by Defendants. Criminal defense attorney Spencer Vodnoy aptly described the terror of such a situation when he said, *"I imagine that being terrorized by a law enforcement officer may be one of the scariest scenarios that any person can be in because ultimately, who do you go to for protection if the person that's terrorizing you is the person that should be protecting you."* I lived this nightmare, knowing the only way to survive was to remain calm, comply, and wait for the moment when I could gather the evidence needed to expose their crime. Almost five years later, I stand here fighting back, with the truth in hand, exposing the heinous crimes committed against me.

196.    Continued Trauma and Violations Under Color of Law:

The continuous trauma I have endured, due to the actions of Officers DENARDI, WILSON, and ROMERO, as well as the Communications Dispatchers, has caused significant and lasting degradation of my rights as a United States citizen. My sense of security, dignity, and peace of mind have been permanently compromised.The Defendants, acting under color of law, engaged in a pattern of conduct designed to deprive me of my constitutionally protected rights without lawful justification. Under *Ex Parte Young*, 209 U.S. 123 (1908), state actors who violate federal

constitutional rights under the color of law are not immune from liability, and the Defendants' actions fall squarely within this doctrine.

197.    Second Cause of Action: Monell Claim – 42 U.S.C. §1983 against CITY and DOES 1-50 I hereby re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this Complaint.

198.    I am informed and believe, and thereon allege, that high-ranking CITY OF OAKLAND officials and DOES 1-50, and/or each of them, knew and/or reasonably should have known about Oakland Police Officers' repeated acts of unconstitutional violations, including but not limited to harassment, illegal surveillance, kidnapping, fabricating police reports, and illegal watchlisting.

199.    Despite having such notice, I am informed and believe, and thereon allege, that CITY OF OAKLAND & DOES 1-50, and/or each of them, approved, ratified, condoned, encouraged, sought to cover up, and/or tacitly authorized the continuing pattern and practice of misconduct and/or civil rights violations by OAKLAND POLICE DEPARTMENT employees by failing to discipline and retrain officers who acted unlawfully and outside of department policy, which brought about Defendants' unlawful actions against me.

200.    I further allege that as a result of the deliberate indifference, reckless, and/or conscious disregard of the misconduct by Defendant Officers and DOES 1-50, and/or each of them, the CITY OF OAKLAND ratified and encouraged these officers to continue their course of misconduct.

201.    I further allege that Defendants DOES 1-50, and/or each of them, were on notice of the Constitutional defects in their training of Oakland Police Officers, including, but not limited to, unlawfully harassing, surveilling, and imprisoning individuals without lawful justification.

202.    The aforementioned acts, omissions, and/or deliberate indifference by high-ranking CITY OF OAKLAND officials, including high-ranking OAKLAND POLICE DEPARTMENT supervisors, DOES 1-50, and each of them, resulted in the deprivation of my constitutional

rights, including, but not limited to, the right to be free from unreasonable searches and seizures, harassment, false imprisonment, and illegal watchlisting by Officers, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

203.    Rule 398.96 – Participation in Civil Matters

I am informed and believe and thereon allege that Officer John JACKO ROMERO violated OAKLAND POLICE DEPARTMENT Memorandum Rule 398.96, which prohibits officers from participating in civil matters except as required by law or departmental regulations. Officer ROMERO's involvement went far beyond mere participation; it became a calculated and coordinated criminal conspiracy to protect his cousin, Moses JACKO, from exposure for running an illegal cannabis operation.

204.    ROMERO's cousin, in clear violation of a restraining order, openly taunted and threatened me. This behavior was part of their coordinated effort to intimidate me, fully emboldened by the knowledge that I was illegally watchlisted. Their actions were not isolated incidents; they were deliberate attempts to use ROMERO's position of power to silence and suppress me. ROMERO's cousin mockingly dismissed my attempts to seek help, further underscoring the belief that they could act with impunity.

205.    This level of collusion between an officer and a family member is unprecedented. Their willingness to go to such extreme lengths—including violating restraining orders and orchestrating my kidnapping—suggests that this was not merely about family loyalty but potentially involved financial interests as well. The combination of these factors reveals a premeditated and organized abuse of power, deeply rooted in both personal and professional misconduct. This is a criminal conspiracy that demands full accountability.

206.    Rule 398.80 – Truthfulness

I am informed and believe and thereon allege that Officer John JACKO ROMERO and other involved officers violated OAKLAND POLICE DEPARTMENT Memorandum Rule 398.80,

which mandates truthfulness and integrity in their professional duties. Rule 398.80 requires officers to maintain honesty in their official actions, including reporting, investigation, and communication. However, Officer ROMERO and others engaged in a coordinated effort to fabricate evidence and mislead the investigation into my wrongful kidnapping. Officer ROMERO's involvement included falsifying documents and creating misleading reports, which directly contravenes the rule's requirement for truthfulness. This breach of integrity undermined the entire investigative process and facilitated the continuation of the unlawful actions against me. The violation of Rule 398.80, coupled with the lack of accountability and oversight, resulted in a significant deprivation of my constitutional rights, including the right to be free from false imprisonment and unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

207.    Rule 398.74 RETALIATION, ACCOUNTABILITY

Officer ROMERO engaged in coordinated efforts to target me, including spending significant time and effort coordinating with dispatchers for false 911 calls, collaborating with Code Enforcement, and fabricating documents. These actions were part of a broader effort to cover up his cousin's illegal cannabis operation. Supervisors, commanders, and managers, who are accountable under OAKLAND POLICE DEPARTMENT Memorandum Rule 398.74, failed to prevent or address this retaliatory behavior. They either knew or should have known about ROMERO's actions, given the extensive coordination required. Their failure to report, investigate, or take corrective measures contributed to the unlawful actions against me. This failure to act and the allowance of such retaliatory behavior by supervisors, commanders, and managers within the OAKLAND POLICE DEPARTMENT contributed to the violation of my constitutional rights, including but not limited to the right to be free from unreasonable searches and seizures, harassment, and false imprisonment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

208.    Rule 398.73 RETALIATION

My reports to Code Enforcement about the illegal tent in my neighbor Moses JACKO's front yard and the illegal cannabis operation were protected activities. After I contacted Code Enforcement, Officer ROMERO, who is in charge of the Cannabis Unit and whose cousin was involved in the illegal cannabis operation, retaliated by writing a false police report on August 15th, 2019, falsely alleging a neighborhood disturbance where none occurred. These retaliatory actions would deter a reasonable person from engaging in further protected activities, thereby violating this rule. The failure of other members and employees to report this misconduct or take corrective action, as required by Rule 398.73, further compounded the harm to me and demonstrates a systemic issue within the OAKLAND POLICE DEPARTMENT. This failure to address retaliation within the department directly contributed to the constitutional violations I suffered.

209.    Rule 370.81 ASSISTING CRIMINALS

I am informed and believe and thereon allege that Officer ROMERO, who is responsible for the Cannabis Unit, assisted his cousin Moses JACKO in maintaining an illegal cannabis operation by retaliating against me for engaging in protected activities, specifically reporting a tent in my neighbor Moses JACKO's front yard and an illegal cannabis operation. After I contacted Code Enforcement on August 8th, 2019, and August 2nd or 3rd, 2019, respectively, Officer ROMERO, who is in charge of the Cannabis Unit and whose cousin was involved in the illegal cannabis operation, wrote a false police report on August 15th, 2019. This report falsely alleged a neighborhood disturbance, despite no such incident occurring. Officer ROMERO, instead of shutting down the illegal cannabis operation I reported, orchestrated my kidnapping, allowing his cousin to continue the illegal operation without interference. This conduct directly violated OAKLAND POLICE DEPARTMENT Memorandum Rule 370.81, which prohibits members and employees from assisting individuals engaged in criminal activity. By targeting me instead of

addressing the illegal cannabis operation, Officer ROMERO helped his cousin evade arrest and continue his criminal activities. The failure of Officer ROMERO's supervisors, commanders, and managers to prevent or address this misconduct further contributed to the violation of my constitutional rights. These actions, combined with the retaliatory behavior already detailed, resulted in the continued operation of the illegal cannabis crop into 2020, when Code Enforcement finally issued a cease-and-desist letter after an anonymous report.

210.    Rule 370.72 COMPROMISING CRIMINAL CASES

I am informed and believe and thereon allege that Officer ROMERO, along with other members of the OAKLAND POLICE DEPARTMENT, improperly influenced and compromised the legal process following my arrest on October 1st, 2019. After I was released from jail, I was scheduled to appear in court on November 1st, 2019, at 9:00 a.m. in Department 112. However, on that day, it appears that the OAKLAND POLICE DEPARTMENT, possibly under the influence or direction of Officer ROMERO, deliberately delayed sending the arrest report to the District Attorney's office until 10:30 a.m., well after my initial court appearance time. This delay was a calculated move to manipulate the legal process, forcing my court appearance to be rescheduled for 2:00 p.m. the same day in Department 15.

211.    The true goal behind this delay was to create a situation where I could be re-arrested, effectively leading to another kidnapping. By changing the time of my hearing and sending the report late, the Defendants aimed to catch me off guard and orchestrate a scenario where I would miss my court appearance, thereby providing a pretext for my re-arrest. This rescheduled hearing was conducted without official notice or record, and I was the only case heard in that department at that time. The lack of official documentation and the unusual handling of my case demonstrate a deliberate attempt to manipulate the legal process.

212.    This improper influence over the legal process violated OAKLAND POLICE DEPARTMENT Memorandum Rule 370.72, which strictly prohibits members from interrupting,

attempting to interrupt, or improperly influencing the legal process. Additionally, Officer ROMERO personally handled my Freedom of Information Act (FOIA) requests for evidence related to my case, including preparing body cam DVDs and audio CDs documenting my kidnapping and the false 911 calls made by his cousin. This represents a clear conflict of interest, as the very person accused of orchestrating and carrying out these unlawful actions was in charge of providing the evidence meant to prove those actions. The possibility of tampering with or withholding critical evidence is evident, which further compromised my ability to obtain a fair legal process.

213.    As a result of these actions, I was ordered by the court to stay 100 yards away from JACKO, effectively preventing me from returning to my home without obtaining a separate court order. These actions, combined with the retaliatory behavior and assistance provided to JACKO's illegal activities, resulted in the violation of my constitutional rights, including but not limited to the right to due process and the right to be free from unreasonable searches and seizures, harassment, and false imprisonment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

214.    Rule 370.45 REPORTS AND BOOKINGS

I am informed and believe, and thereon allege, that Officer ROMERO, along with other members of the OAKLAND POLICE DEPARTMENT, including Victoria DENARDI, Binh Tran, Officer Janey MEEKS-HAY, and multiple dispatchers, knowingly submitted false and inaccurate Departmental records with the intent to assist in the prosecution against me. Specifically, Officer DENARDI filed a false police report and manufactured probable cause against me, while Officer Tran misrepresented the facts in another report.

215.    Officer Janey MEEKS-HAY, whose involvement is particularly concerning due to her prior knowledge of the false police report filed by Moses JACKO and his illegal cannabis operation, was assigned as the primary officer on the day of my kidnapping. Despite requests for

documentation related to her involvement, the OAKLAND POLICE DEPARTMENT has refused to provide any records, likely due to her connection as the daughter of a former Oakland Police Captain, James MEEKS.

216.    Multiple dispatchers were also involved in building false documentation and responding to multiple false 911 calls. These dispatchers dismissed serious threats made against me, including threats of violence, intimidation, and other criminal behavior. Despite receiving 911 calls where threats were made against me, including threats to come into my house and physically harm me, as well as allowing pit bulls to enter my yard, the dispatchers failed to take appropriate action.

217.    On the day of my kidnapping, the fake victim, Moses JACKO, made an aggressive and threatening statement to Officers WILSON and DENARDI, saying, "She wants me to lay hands." Despite the clear relevance of this statement, particularly in the context of JACKO's claim of elder abuse, the officers failed to document this threatening remark. This omission further demonstrates the officers' bias and their coordinated effort to protect JACKO while targeting me.

218.    These actions by the dispatchers and officers were part of a coordinated effort to create a false narrative against me, justify the unlawful actions taken against me, and contribute to a broader theme of constructing a false mental health narrative. The repeated filing of false police reports and creation of false records by various members of the OAKLAND POLICE DEPARTMENT directly violated OAKLAND POLICE DEPARTMENT Memorandum Rule 370.45, which strictly prohibits the falsification of reports, records, and evidence. The intent behind manufacturing these false police reports was to create historical events that would later be used to justify the unlawful actions taken against me.

219.    This coordinated effort to falsify official documents and manipulate 911 calls was intended to assist in the prosecution against me and contributed to the violation of my

constitutional rights. The failure of the OAKLAND POLICE DEPARTMENT's leadership to address these violations and hold the responsible officers and dispatchers accountable further contributed to the deprivation of my rights, including but not limited to the right to due process, the right to be free from unreasonable searches and seizures, and the right to a fair trial, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

220. Rule 370.36 CUSTODY OF PRISONERS

I am informed and believe and thereon allege that Officer Victoria DENARDI, along with Officer Mark WILSON, violated my rights and OAKLAND POLICE DEPARTMENT Memorandum Rule 370.36 regarding the custody and treatment of prisoners. I was falsely arrested based on manufactured probable cause, and the entire situation was a kidnapping under the direction of Officer ROMERO. Despite knowing that the charges against me were fabricated, Officer DENARDI twice subjected me to unlawful searches, violating my bodily integrity and personal dignity. Officer DENARDI also handcuffed and physically touched me during these arrests, knowing that there was no legal basis for such actions. Officer Mark WILSON similarly participated in this unlawful detention, further exacerbating the violation of my rights. Rule 370.36 mandates that arrestees and detainees be treated humanely and not subjected to unnecessary restraint. However, the actions of Officers DENARDI and WILSON were neither necessary nor humane, as they were based on a false premise and were part of an orchestrated effort to kidnap me. The violation of this rule, along with the failure to ensure that my rights were protected during the arrest and detention, contributed to the deprivation of my constitutional rights. The involvement of multiple officers in this coordinated effort, combined with the lack of accountability within the OAKLAND POLICE DEPARTMENT, resulted in significant harm to me, including the violation of my rights to be free from unreasonable

searches and seizures, false imprisonment, and cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

221.    Rule 370.27 PHYSICAL FORCE, USE OF

I am informed and believe and thereon allege that Officers Mark WILSON and Victoria DENARDI violated OAKLAND POLICE DEPARTMENT Memorandum Rule 370.27, which restricts the use of physical force to circumstances specified by Departmental policies and law. Although I was not subjected to excessive or violent force, the physical contact made by Officers WILSON and DENARDI was unjustified and unnecessary, as it was based on manufactured probable cause and a false arrest. Officer WILSON grabbed my arm to forcefully place me under arrest, despite knowing that the charges were fabricated and that the arrest was part of a coordinated effort to target me. Similarly, Officer DENARDI grabbed me and placed me in handcuffs, even though there was no legal basis for such actions. While the force used was not excessive because I remained calm, the physical contact itself was a violation of my rights and would have likely escalated to more forceful measures had I not remained calm. The use of physical force in this context, even if not excessive, was a violation of Rule 370.27, as it was not justified under Departmental policies or the law. This violation, combined with the other wrongful actions taken against me, contributed to the deprivation of my constitutional rights, including the right to be free from unreasonable searches and seizures, false imprisonment, and cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

222.    Rule 356.90 UNAUTHORIZED USE OF ELECTRONIC SYSTEMS

I am informed and believe and thereon allege that Officer Christopher Kelly, along with Officer ROMERO and others within the OAKLAND POLICE DEPARTMENT, violated OAKLAND POLICE DEPARTMENT Memorandum Rule 356.90 by unauthorizedly accessing and using electronic systems to monitor my Facebook page and collect personal information. Officer Kelly

collected 28 of my Facebook posts, which were created before any restraining order was issued, and provided them to the District Attorney as part of the criminal prosecution, despite me having no criminal record and no prior knowledge of Officer Kelly. Additionally, Officer ROMERO made references in court documents to topics I discussed on Facebook, such as nanotechnology and non-consensual human experimentation, further indicating that I was being electronically monitored without authorization.

223.    ROMERO even created another document questioning why I would continue posting on Facebook when my posts "can and will be used against me," highlighting the unauthorized and coercive nature of this monitoring. This unauthorized surveillance extended to my computer and phone, both of which were hacked, leading to further violations of my privacy and rights. Furthermore, ROMERO's cousin, Gwendolyn JACKO, falsely accused me of hacking her phone and computer in Las Vegas, despite me having no knowledge of or connection to Gwendolyn JACKO.

224.    The baseless accusations, combined with the unauthorized electronic monitoring and hacking, were part of a broader effort to target me and build a false mental health narrative, which was further supported by the coordinated actions of the dispatchers in creating false 911 calls and dismissing legitimate threats against me. Officer ROMERO also personally handled my Freedom of Information Act requests, including preparing body cam DVDs and audio CDs related to my kidnapping and the false 911 calls.

225.    Moreover, ROMERO utilized work computers at the OAKLAND POLICE DEPARTMENT to type up documents that were associated with the fabricated police report and the fraudulent Elder Abuse Temporary Restraining Order. These documents were not just handwritten but were also produced on departmental computers, which indicates a deliberate misuse of police resources to carry out these unlawful activities.

226.    These actions, which involved unauthorized access to electronic systems and the improper use of personal data, directly violated Rule 356.90 and contributed to the violation of my constitutional rights, including but not limited to the right to privacy, due process, and protection from unreasonable searches and seizures, as guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

227.    Rule 342.96 DEPARTMENTAL INSIGNIA

I am informed and believe and thereon allege that Officer ROMERO violated OAKLAND POLICE DEPARTMENT Memorandum Rule 342.96 by unauthorizedly reproducing and using the Departmental insignia. Specifically, Officer ROMERO photocopied the OAKLAND POLICE DEPARTMENT insignia and included it in court records as part of his response to my restraining order against Moses JACKO. By doing so, he created the appearance of official documentation, which could mislead the court and others into believing that the evidence he presented was officially sanctioned by the OAKLAND POLICE DEPARTMENT. The use of the Departmental insignia in this manner was not authorized by competent authority and was intended to lend undue credibility to the false evidence and arguments made in response to my restraining order. This unauthorized use of the insignia, combined with the other violations detailed in this complaint, contributed to the unlawful actions taken against me and the violation of my constitutional rights. These actions further demonstrate the systemic issues within the OAKLAND POLICE DEPARTMENT, where officers feel empowered to misuse official insignia and other resources to support unlawful activities, thereby violating my rights, including but not limited to due process and equal protection under the law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

228.    WHEREFORE, I pray for relief as hereinafter set forth.

Third Cause of Action: Intentional Infliction of Emotional Distress I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

229.   The Defendants' conduct was not only intentional and reckless but also carried out with the specific purpose of causing me severe emotional distress. The actions of harassment, false imprisonment, illegal surveillance, illegal watchlisting, and the use of criminal informants as organized gang stalkers were designed to inflict maximum emotional suffering and distress upon me.

230.   The Defendants' actions, including orchestrating my kidnapping, subjecting me to continuous surveillance, and deploying organized gang stalkers against me, have caused a profound and lasting emotional impact. I have experienced intense fear, anxiety, and psychological trauma as a result of their actions, and I continue to endure emotional suffering on a daily basis. The betrayal by those who were supposed to protect me, combined with the ongoing harassment and intimidation, has deeply affected my mental and emotional well-being.

231.   This intentional infliction of emotional distress has degraded my quality of life, stripped away my sense of security, and left me in a constant state of fear and distress. The Defendants' reckless disregard for my emotional and psychological well-being is evident in every action they have taken against me, and the harm they have caused is immeasurable.

232.   WHEREFORE, I pray for relief as hereinafter set forth.

Fourth Cause of Action: False Imprisonment

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

233.   The Defendants' actions, including kidnapping and false imprisonment, deprived me of my liberty without any legal justification. Acting under color of law, the Defendants—including Oakland Police Officers John JACKO ROMERO, Janey MEEKS-HAY, Mark WILSON, Victoria DENARDI, Christopher Kelley, Sgt. Bowlings, along with dispatchers and others—knowingly conspired to orchestrate my unlawful detention. Their collective efforts,

coordinated on October 1st, were the culmination of a 48-day campaign designed to falsely imprison me through fabricated allegations and unlawful surveillance.

234.   48-Day Timeline Leading to the Kidnapping:

- August 15, 2019: False Police Report: Officer John JACKO ROMERO wrote a false police report (19-048359) against me. This report was closed on September 17, 2019.

- September 17, 2019: False Elder Abuse TRO: ROMERO wrote a false Elder Abuse Temporary Restraining Order (TRO) (HF19035537), attaching the false police report to it. The TRO was approved on September 18, 2019, served to me on September 24, 2019, and entered into the CLETS system on September 27, 2019.

- October 1, 2019: Reporting Party (RP) Card: Officer ROMERO wrote an RP card to set up the final piece for my kidnapping. He orchestrated the entire operation over 48 days, using the RP card to make the false restraining order and police report appear legitimate.

235.   The timeline of this conspiracy is fully documented in Alameda County Superior Court public records. Body cam footage showing the RP card further corroborates this, and handwriting analysis reveals that ROMERO authored all the critical documents leading to my kidnapping.

236.   Conspiracy to Kidnap on October 1st:

237.   On October 1st, all involved parties came together to execute my kidnapping, which was broadcast over the airwaves throughout the day. My name, "LaJuana Reid, 7839 Lockwood Street, 5150", was deliberately transmitted over police radio, ensuring that the entire department was aware of the conspiracy. Despite being out shopping and committing no crime, they proceeded to enact their plan, which had been meticulously crafted in the 48 days following my move into the neighborhood.

238.   This conspiracy was not just a random act but was calculated to boost the careers of those involved, as my illegal watchlist status made me a high-profile target. The Defendants were fully

aware of this, and their deliberate actions were taken to silence and oppress me, knowing the gravity of the operation.

Roles of the Defendants:

239.    Officer John JACKO ROMERO: Orchestrated the entire conspiracy by writing the false police report, Elder Abuse TRO, and RP card to manufacture probable cause for the kidnapping. ROMERO's actions formed the backbone of this 48-day conspiracy.

240.    Officers Mark WILSON and Victoria DENARDI: Carried out the physical act of kidnapping, following ROMERO's orders and acting on false information.

241.    Dispatcher McKELLAR initially documented the location as my name and address, 7839 Lockwood Street, even though Moses JACKO was the person who called. There was no reason to place my location, especially since nothing happened at my house. By placing my name and location at the top of the document, McKELLAR set the stage for manipulation. Throughout the day, the dispatchers, including McKELLAR, DELOVE, INGRAM, and TAYLOR, broadcast this false information over the airwaves and repeatedly documented "location 5150" to create the illusion of a mental health crisis.

242.    Their actions were designed to incite reactive abuse, believing I would respond to the kidnapping with emotional or physical resistance. This reaction would have justified the false 5150 mental health narrative, enabling them to escalate the situation further. The stage was set to commit murder, with the justification for any extreme action already documented. Had I reacted, they could have framed my response as proof of the fabricated mental health crisis, giving them a pretext for fatal force.

243.    Officer Janey MEEKS-HAY: Though not physically present during the kidnapping on October 1st, she was deeply involved in planning and orchestrating the operation, acting as the Primary officer. 30 days prior, on September 1st, MEEKS-HAY arrived at my home with a crew

of white male officers, using her race as a Black woman to manipulate me into believing she was on my side. She was CIT-trained, specifically there to build a false mental health narrative against me. I clearly exposed the truth to her—that Moses JACKO had made a false 911 call and was growing illegal cannabis. Despite this, one of her officers dismissed my claims, saying, "We can't arrest anyone who lies," and claiming JACKO had a cannabis license. MEEKS-HAY ignored and dismissed all of this evidence, choosing instead to contribute to a false mental health narrative about me.

244.    When I later obtained the police report from October 1st, MEEKS-HAY was named as the Primary officer, even though she was nowhere on the scene. She was pulling the strings from behind the scenes, having the entire kidnapping live-streamed to her via body cams because she couldn't show her face after I had exposed JACKO's lies. Her involvement didn't stop there—when I was taken to Santa Rita Jail, I was confused when they said they were doing a psych eval on me, which made no sense. This was because MEEKS-HAY had orchestrated the paperwork to justify the psych evaluation, continuing her efforts to push a false narrative. On top of that, none of the officers on the September 1st visit claimed to have body cams on, despite the fact that I am illegally watchlisted.

245.    MEEKS-HAY played a central role in fabricating evidence, dismissing the truth, and working behind the scenes to build a false mental health case against me.

246.    Christopher Kelley: Collected my Facebook posts related to organized gang stalking, using them to justify the cover-up of their illegal activities, including Moses JACKO's illegal cannabis operation.

Fabrication of Evidence and Lack of Probable Cause:

247.    The entire conspiracy was fabricated. Nothing happened on October 1st to justify my detention. Moses JACKO was never outside my home, and no proximity violation occurred. The

false restraining order, crime report, and RP card were all part of the orchestrated effort to falsely imprison me. The Defendants knew there was no probable cause, but they proceeded with the kidnapping to intimidate and silence me.

248.   Legal Precedents and Statutes:

- False Imprisonment: The Defendants' actions violate California Penal Code Section 236, which defines false imprisonment as the unlawful violation of another's liberty. The Defendants' concerted actions to fabricate evidence and orchestrate my detention meet the criteria for false imprisonment, as there was no lawful justification for their actions.

- Fourth Amendment Violations: The Defendants' conduct also violates the Fourth Amendment to the U.S. Constitution, which protects against unreasonable searches and seizures. The U.S. Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967), affirmed that the Fourth Amendment guarantees freedom from unwarranted government intrusion, making their actions a clear breach of this fundamental protection.

- Due Process: By fabricating evidence and creating a false proximity violation, the Defendants deprived me of due process, violating my Fourteenth Amendment rights as established in *Zinermon v. Burch*, 494 U.S. 113 (1990). The conspiracy to detain me without cause, using false information, is a clear example of arbitrary governmental action that violates due process.

- 42 U.S.C. §1983: The Defendants, acting under color of state law, are liable for the deprivation of my constitutional rights under 42 U.S.C. §1983, as established in *Monroe v. Pape*, 365 U.S. 167 (1961). Their actions to falsely imprison me, relying on fabricated documents, directly violate my rights under federal law.

Excessive Bail:

249.    As a further act of oppression, I was forced to pay a $20,000 bail—essentially a ransom—to secure my release. This excessive bail, imposed without probable cause, violates the Eighth Amendment's prohibition against excessive bail, as established in *Stack v. Boyle*, 342 U.S. 1 (1951). The imposition of such an exorbitant bail amount, without legitimate grounds, further compounded the emotional and financial harm inflicted upon me.

Emotional and Psychological Impact:

250.    The Defendants' actions have caused immeasurable emotional and psychological harm. Being unlawfully detained, humiliated, and treated as a criminal has left me in a state of constant fear and anxiety. The conspiracy to falsely imprison me has stripped away my sense of security, leaving me with lasting trauma. The knowledge that these individuals, sworn to uphold the law, conspired to violate my rights has profoundly impacted my mental and emotional well-being. The emotional distress caused by the Defendants' deliberate actions constitutes intentional infliction of emotional distress, compounding the severity of their unlawful conduct.

Conclusion:

251.    The kidnapping, false imprisonment, and imposition of excessive bail were carried out in a coordinated and deliberate manner by the Defendants, stripping me of my dignity, liberty, and freedom. The conspiracy orchestrated by the dispatchers, officers, and others involved was designed to intimidate, silence, and oppress me. These actions have caused ongoing fear, anxiety, and a profound sense of injustice, violating my rights under the First, Fourth, Eighth, and Fourteenth Amendments, and under California law. The Defendants must be held fully accountable for their unlawful conduct under 42 U.S.C. §1983 and California Penal Code Section 236

252.    Fifth Cause of Action: Malicious Prosecution

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

253.   The Defendants maliciously initiated legal proceedings against me without probable cause and with the intent to harm me. These proceedings were not only baseless but were also part of a broader campaign of harassment, intimidation, and retaliation designed to silence me and destroy my reputation.

254.   The Defendants, acting under color of law, fabricated evidence, filed false reports, and coerced witnesses to falsely accuse me of crimes I did not commit. This malicious prosecution was carried out with full knowledge that there was no legitimate basis for the charges brought against me. The false reports and fabricated evidence were used to unjustly prosecute me, forcing me to defend myself against false accusations and subjecting me to the stress and anxiety of criminal proceedings.

255.   The malicious prosecution was intended to cause me harm, both emotionally and psychologically, as well as to damage my standing in the community. The Defendants' actions were designed to undermine my credibility, tarnish my reputation, and prevent me from seeking justice for the wrongs committed against me.

256.   This malicious prosecution has had a profound and lasting impact on my life, causing significant emotional distress, financial hardship, and damage to my reputation. The Defendants' abuse of the legal process for their own malicious purposes violated my constitutional rights, including my right to due process and equal protection under the law.

WHEREFORE, I pray for relief as hereinafter set forth.

257.   Sixth Cause of Action: Defamation (Slander and Libel)

---

258.    I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

259.    The Defendants made false and defamatory statements about me, damaging my reputation and causing significant harm to my personal and professional life. These false statements were disseminated through various channels, including crime reports, public broadcasts, neighborhood petition, and other official communications, all with the intent to portray me as a criminal and mentally unstable.

260.    The Defendants labeled me as a "chronic issue," a code used to trigger a response from CIT-trained officers, such as Officer Janey MEEKS-HAY. This labeling was part of a deliberate strategy to build a false mental health narrative against me. Officer Janey MEEKS-HAY and others used this code to justify writing false police reports that portrayed me as unstable and a threat to my community. These false reports were then broadcasted, and my name was included in crime reports that were disseminated to government agencies and other entities.

261.    Dispatchers further contributed to this defamatory campaign by using derogatory terms to describe me, including calling me a "short black heavy set woman," despite the fact that I have never been heavy set. They repeatedly referred to me as "5150," asking if I had mental health issues or if I was crazy. These derogatory terms and labels were broadcasted over radio traffic, including statements such as "Lawanna Reed, 7839, 5150." The intent behind these broadcasts was to incite a reaction from me through what is known as reactive abuse, where the perpetrator manipulates events and narratives to provoke a response from the victim.

262.    In addition to these actions, Officer ROMERO typed up a neighborhood petition that falsely accused me of harassment, invasion of privacy, trespassing, aggravated assault, and slandering of character. He then had his informant cousin, JACKO, take this petition to the neighbors listed, who signed it despite the fact that I do not know these people. This petition was another element in the Defendants' broader strategy to create a false historical narrative that

could later be used to justify potential actions against me, including the use of force. By fabricating and disseminating these defamatory materials, the Defendants sought to destroy my credibility, isolate me, and justify their ongoing harassment and intimidation.

263.    Officer ROMERO, who was orchestrating these actions from behind the scenes, created false documents but could not participate directly in the civil matter due to his relationship with his cousin and his role overseeing the Cannabis Unit, while his cousin was involved in illegal cannabis activities. Instead, he had his informant cousin file these false documents with the court. These documents falsely stated that it was "obvious to my neighbors, the City of Oakland, and the OAKLAND POLICE DEPARTMENT" that I was unstable and a threat.

264.    These defamatory actions have caused lasting damage to my reputation, leading to emotional distress, social ostracization, and a loss of opportunities. The Defendants' conduct was carried out under color of law, with a clear intent to harm me and undermine my efforts to seek justice for the wrongs committed against me. Their reckless and malicious actions have violated my rights and caused significant harm to my personal and professional life.

265.    WHEREFORE, I pray for relief as hereinafter set forth.

Seventh Cause of Action: Civil Conspiracy

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

266.    The Defendants conspired together to commit a series of unlawful acts against me, including harassment, false imprisonment, defamation, illegal watchlisting, and a planned kidnapping. This conspiracy was orchestrated through coordinated efforts among various members of the OAKLAND POLICE DEPARTMENT, including Officer ROMERO, Officer Janey MEEKS-HAY, and others, who worked together to target and harm me.

267.    The conspiracy involved a deliberate and calculated plan to violate my rights through a series of actions designed to intimidate, discredit, and isolate me. The Defendants engaged in

actions such as fabricating evidence, filing false reports, broadcasting defamatory statements, manipulating legal processes, and orchestrating a kidnapping to unjustly detain and malign me. They also employed criminal informants, organized gang stalkers, and CIT-trained officers to carry out their coordinated attacks, all with the intent to provoke a reaction from me and justify their unlawful actions.

268.   In addition to these actions, a crime report from the OAKLAND POLICE DEPARTMENT shows that I was placed on an illegal watchlist, labeled as subject number 9596690-00. Despite my requests, the OAKLAND POLICE DEPARTMENT refused to release this crime report. However, it was accidentally released through another government agency, further exposing the Defendants' coordinated efforts to surveil, harass, and target me.

269.   Officer ROMERO, despite being unable to participate directly in certain civil matters due to his connection with his cousin and his role overseeing the Cannabis Unit, orchestrated many of these actions from behind the scenes. He created false documents and had his informant cousin, JACKO, file them with the court, furthering the conspiracy to falsely portray me as a criminal and mentally unstable. Dispatchers were also involved, using derogatory terms and broadcasting false information about me to incite a reaction and perpetuate the false narrative.

270.   The conspiracy extended beyond individual actions and was part of a broader strategy to undermine my credibility, damage my reputation, and justify the use of force against me. The Defendants' coordinated efforts to create a false historical record, manipulate the legal system, place me on an illegal watchlist, and execute a kidnapping resulted in significant harm to me, including emotional distress, social ostracization, and the ongoing violation of my rights.

271.   This civil conspiracy, which included the planned kidnapping and illegal watchlisting, violated my rights under the United States Constitution and caused lasting damage to my life. The Defendants' reckless and malicious conduct, carried out under color of law, reflects a complete disregard for my rights and well-being.

272.    WHEREFORE, I pray for relief as hereinafter set forth.

Eighth Cause of Action: Violation of the California Bane Act (Civil Code § 52.1)

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

273.    The Defendants, through a consistent pattern of threats, intimidation, and coercion, interfered with my constitutional rights, in direct violation of the California Bane Act (Civil Code § 52.1). These unlawful actions were not isolated incidents but part of a broader strategy to harass, intimidate, and coerce me into submission, stripping me of my rights under both state and federal law.

274.    The Defendants used their positions of authority to conduct illegal surveillance, initiate false arrests, fabricate evidence, and manipulate legal processes, all with the intent to deprive me of my constitutional rights. This continuous harassment included, but was not limited to, broadcasting defamatory statements about me, placing me on an illegal watchlist, orchestrating a kidnapping, and creating false reports to justify their actions.

275.    The threats and intimidation tactics employed by the Defendants were designed to instill fear and force me into silence, preventing me from exercising my rights to free speech, due process, and equal protection under the law. The use of derogatory terms, constant references to mental instability, and the deliberate creation of a false historical narrative were all part of the coercive tactics used to undermine my credibility and isolate me from potential support.

276.    The Defendants' actions violated my rights to be free from unreasonable searches and seizures, to due process, and to equal protection under the law, as guaranteed by the United States Constitution. The Bane Act specifically prohibits any person from interfering with someone else's rights through threats, intimidation, or coercion, which is precisely what the Defendants did to me.

277.    Their continuous harassment and illegal actions, carried out under color of law, violated the Bane Act and caused me significant harm, including emotional distress, social ostracization, and a profound sense of fear and vulnerability.

278.    WHEREFORE, I pray for relief as hereinafter set forth.

Ninth Cause of Action: Violation of the Ralph Act (Civil Code § 51.7)

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

279.    The Defendants committed acts of violence, threats, and intimidation against me based on my race, gender, and other protected characteristics, in violation of the Ralph Civil Rights Act (Civil Code § 51.7). The Ralph Act protects individuals from violence or threats of violence based on characteristics such as race, gender, religion, or sexual orientation, and the Defendants' actions clearly targeted me because of these protected characteristics.

280.    The Defendants used their positions of authority to subject me to a campaign of harassment, intimidation, and violence, knowing that these actions would have a particularly harmful impact due to my race and gender. This campaign included, but was not limited to, orchestrating a kidnapping, fabricating evidence, broadcasting defamatory statements, and using derogatory terms that referenced my race and gender in a disparaging and dehumanizing manner.

281.    The constant references to me as a "5150" and the use of derogatory terms like "short black heavy set woman" were not only false but were intended to stigmatize and marginalize me based on my race and gender. These actions were designed to reinforce harmful stereotypes and justify the Defendants' unlawful actions against me. The Defendants also sought to portray me as a threat, leveraging racist and sexist tropes to manipulate public perception and justify their ongoing harassment and intimidation.

282.    The Defendants' actions created an environment of fear, hostility, and violence, all rooted in racial and gender-based discrimination. By targeting me based on my protected characteristics,

the Defendants violated my rights under the Ralph Act and caused me significant emotional distress, social isolation, and a profound sense of vulnerability.

283.    These actions were not only unlawful but were carried out under color of law, with the Defendants abusing their positions of power to carry out a campaign of violence and intimidation against me. The Ralph Act prohibits such discriminatory violence and threats, and the Defendants' actions represent a clear violation of these protections.

284.    WHEREFORE, I pray for relief as hereinafter set forth.

Tenth Cause of Action: Negligent Supervision and Retention

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

285.    The CITY OF OAKLAND and supervisory defendants failed in their duty to adequately supervise and discipline officers and dispatchers, thereby allowing the unlawful actions against me to occur. This negligence in supervision and retention directly contributed to the pattern of harassment, false imprisonment, defamation, illegal watchlisting, and the planned kidnapping that I have endured.

286.    Despite clear warning signs and numerous complaints, the CITY OF OAKLAND and the supervisory defendants did not take appropriate action to address the misconduct of officers such as Officer ROMERO, Officer Janey MEEKS-HAY, and others involved in the conspiracy against me. These officers were allowed to operate with impunity, engaging in unlawful activities under the color of law without fear of repercussions.

287.    The failure to discipline and supervise these officers created an environment where misconduct was not only tolerated but effectively encouraged. The CITY OF OAKLAND and the supervisory defendants ignored or dismissed clear evidence of wrongdoing, allowing officers and dispatchers to continue their campaign of harassment and intimidation against me. This negligent supervision and retention extended to allowing the dissemination of false information,

the manipulation of legal processes, and the use of criminal informants and organized gang stalkers to target me.

288.    The CITY OF OAKLAND and supervisory defendants' failure to take corrective action enabled the officers and dispatchers to persist in their unlawful actions, resulting in significant harm to me. Their negligence has caused me emotional distress, social isolation, damage to my reputation, and ongoing fear for my safety.

289.    This pattern of negligent supervision and retention reflects a disregard for my rights and well-being, as well as a failure to uphold the standards of conduct required of law enforcement personnel. The CITY OF OAKLAND and the supervisory defendants' inaction directly contributed to the violations of my constitutional rights and the harm I have suffered as a result.

290.    WHEREFORE, I pray for relief as hereinafter set forth.

Eleventh Cause of Action: Failure to Intervene

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint.

291.    The Defendants, while acting under the color of law, failed to intervene to prevent the violation of my constitutional rights, despite having the opportunity and duty to do so. This failure to intervene allowed the ongoing harassment, false imprisonment, defamation, and other unlawful actions against me to continue unchecked.

292.    One of the officers involved, Officer Carrillo, was placed in a challenging position during the events leading up to my false arrest and harassment. When JACKO changed his story—initially stating that I was on my porch screaming and hollering, and later claiming that I was watering my grass and cursing at him—Officer Carrillo had the opportunity to alert Officers WILSON and DENARDI to this inconsistency. Additionally, Officer Carrillo informed Officers WILSON and DENARDI that he had previously been called out to perform a mental health check on JACKO. Despite this crucial information, WILSON ignored it, dismissing Carrillo's

concerns by saying, "Oh well, he has a good restraining order," even though WILSON never actually asked JACKO about a restraining order.

293.    Further, Officer ROMERO wrote the Reporting Party (RP) card related to the supposed violation of the temporary elder abuse restraining order. When JACKO mentioned that ROMERO was his cousin, WILSON acknowledged knowing ROMERO. Minutes later, WILSON requested the RP card, which DENARDI handed to him. Both WILSON and DENARDI were fully aware of the familial relationship between ROMERO and JACKO, yet they continued with my kidnapping despite the clear conflict of interest and the fabricated nature of the claims.

294.    After I was taken into custody, Officer DENARDI made it explicitly clear that she would not intervene to protect my rights. Instead, she stated, "Every time he calls us, you are going to jail no matter what," indicating that under no circumstances would she be intervening on my behalf. This statement reflects a predetermined intent to arrest and detain me regardless of the actual circumstances or evidence, further demonstrating her intent to perpetuate the violation of my rights rather than prevent it.

295.    Moreover, when JACKO violated the two-year restraining order that I had against him, Officer DENARDI took no action, further demonstrating her disregard for my rights and safety. This lack of action, combined with her explicit statement, highlights her role in perpetuating the ongoing violations against me.

296.    Despite these challenges, Officer Carrillo demonstrated integrity in his police reports, accurately noting that I was calm and polite during the encounter. He also included crucial information in the crime report that eventually helped uncover the targeting and illegal actions taken against me. I recognize that Officer Carrillo may have done what he could within the constraints of his role, and I am grateful for his honesty in documenting the events as they

occurred. Because of this, I have chosen not to name Officer Carrillo as a defendant in this action.

297.    However, the broader failure of the Defendants, particularly Officers WILSON and DENARDI, to intervene when they had a clear duty to do so allowed the violations of my rights to persist. Their inaction, compounded by their knowledge of the conflict of interest involving ROMERO and JACKO, enabled the unlawful conspiracy against me to continue, resulting in significant harm to my emotional well-being, reputation, and sense of security.

298.    The Defendants' failure to intervene, coupled with Officer DENARDI's explicit statement that she would only take action against me and her failure to act when JACKO violated the restraining order, reflects a disregard for their duty to uphold the law and protect the rights of individuals, including my own. Their inaction directly contributed to the violations of my constitutional rights and the harm I have suffered as a result.

299.    WHEREFORE, I pray for relief as hereinafter set forth.

Twelfth Cause of Action: Trespass

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint. Defendants, including Officer Mark WILSON, unlawfully entered my property without permission, causing damage and distress. Specifically, Officer WILSON ordered me to his car and then proceeded to criminally trespass into my home without my consent or legal justification. During this unlawful entry, I believe Officer WILSON was live streaming the entire event from his body cam back to the OAKLAND POLICE DEPARTMENT, particularly to Janey MEEKS-HAY and Officer John JACKO ROMERO. This belief is supported by the fact that I am illegally watchlisted, which would reasonably explain why such live streaming would occur. The live stream likely included a recording of the entire event and layout of my home, further violating my privacy. This unauthorized entry, combined with the alleged live streaming and

recording of my home's interior, exacerbated the invasion of my privacy and caused significant emotional distress. This conduct constitutes trespass and resulted in harm to me.

300.    WHEREFORE, I pray for relief as hereinafter set forth.

Thirteenth Cause of Action: Violation of Federal Kidnapping Act (18 U.S.C. §1201)

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint. Defendants' actions on October 1st, 2019, involved a coordinated and deliberate effort to kidnap me from my home without legal justification, in violation of the Federal Kidnapping Act (18 U.S.C. §1201). This kidnapping was orchestrated under the color of law by members of the OAKLAND POLICE DEPARTMENT, specifically Officer John JACKO ROMERO, Officer Victoria DENARDI, and Officer Mark WILSON, among others.

301.    The foundation for this kidnapping was laid by Officer ROMERO on August 15th, 2019, when he authored a false police report that fabricated a narrative of a neighborhood disturbance. This false report was the critical first step in a broader plan to target and silence me due to my complaints about illegal activities on the property of ROMERO's cousin, Moses JACKO. By creating this false police report, ROMERO established the necessary pretext to take further legal actions against me.

302.    Building on this foundation, ROMERO then authored a fraudulent Temporary Restraining Order (TRO) for his cousin to file in family court, knowing that the threshold for obtaining such an order was low. ROMERO exploited this low threshold to ensure that the TRO would be easily approved, despite its basis in falsehoods. In an effort to make the TRO appear more legitimate, ROMERO falsely claimed that JACKO was requesting custody of a pit bull named Dominique JACKO, from me, implying that there was a personal relationship between me and JACKO. This was entirely untrue—I had no relationship with JACKO, no interest in his animals, and had no involvement with his pit bull. By including this fabricated detail, ROMERO

intentionally misled the court, making it appear as though there was a more intimate and personal conflict that required legal intervention.

303.    With the fraudulent TRO in place, supported by the false police report and incident cards issued by other officers, ROMERO orchestrated my kidnapping by issuing a Reporting Party (RP) card, directing Officers WILSON and DENARDI to carry out the unlawful arrest. On October 1st, 2019, WILSON and DENARDI executed the kidnapping under the direction of ROMERO. WILSON ordered me to his patrol car and, within seconds of issuing this order, criminally trespassed into my home without permission or legal justification. During this unlawful entry, I believe WILSON was live streaming the entire event from his body cam back to the OAKLAND POLICE DEPARTMENT, particularly to Janey MEEKS-HAY and Officer ROMERO, due to my illegal watchlisting status. This live stream likely included a recording of the entire layout of my home, further violating my privacy.

304.    WILSON and DENARDI then manufactured probable cause to justify my unlawful arrest by employing multiple false scenarios. They first cited proximity, falsely claiming that I was either on my porch or watering my grass when no disturbance occurred. They then attempted to frame my social media activity, particularly my references to gang stalking, as evidence of a false mental health narrative. Their focus on discrediting my legitimate concerns about gang stalking and their attempt to build this false narrative were deliberate efforts to cover up their involvement in a broader gang stalking program. In doing so, they ignored the actual reason for their presence, which was JACKO's fraudulent elder abuse restraining order.

305.    These coordinated actions culminated in my unlawful transportation across jurisdictional lines. The kidnapping, executed under the guise of enforcing a fraudulent TRO, was a gross abuse of power and a violation of my constitutional rights. The traumatic impact of this kidnapping has caused me lasting emotional and psychological harm, and I continue to seek justice for this egregious violation of my rights.

306.   WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

Fourteenth Cause of Action: Violation of Bodily Integrity and Unlawful Search

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint. On October 1st, 2019, Defendants, including Officer Victoria DENARDI, violated my Fourth Amendment rights through an unlawful search of my personal belongings and my person. Despite the fabricated charges against me, which were based on a false narrative created by Officer John JACKO ROMERO, there was no legal justification for the invasive search conducted by Officer DENARDI.

307.   During this incident, Officer DENARDI unlawfully searched my purse and other personal belongings, disregarding my right to privacy and my bodily integrity. She further compounded this violation by conducting a physical search of my person, including placing me in handcuffs, despite knowing that the arrest and the search were predicated on manufactured probable cause. These actions were conducted under the color of law, yet lacked any legitimate legal basis, and were part of a broader scheme to intimidate, harass, and cause distress.

308.   The unlawful search and the violation of my bodily integrity caused me significant emotional distress, humiliation, and a deep sense of violation. The trauma of being subjected to such treatment without any lawful reason has had a lasting impact on my well-being. The actions taken by Officer DENARDI were a gross abuse of power and a clear violation of my constitutional rights, specifically those guaranteed by the Fourth Amendment to the United States Constitution.

WHEREFORE, I pray for relief as hereinafter set forth.

309.   Fifteenth Cause of Action: Filing and Use of False Police Reports

I re-allege and incorporate by reference paragraphs 1 through [last paragraph number] of this complaint. The Defendants, including Officer John JACKO ROMERO, Officer Binh Tran, and

Officer Victoria DENARDI, systematically filed false police reports against me. These reports were deliberately crafted to justify subsequent unlawful actions, including my false imprisonment and malicious prosecution.

310.    Officer ROMERO laid the foundation for this campaign by authoring the initial false police report that falsely claimed a neighborhood disturbance, which was used to justify further actions against me. This false report was part of a coordinated effort to target me, create a fraudulent narrative, and cover up illegal activities related to ROMERO's cousin, Moses JACKO.

Officer Binh TRAN further contributed to this scheme by filing a police report that inaccurately stated I "had" a restraining order, despite the fact that the restraining order was a two-year order with 19 months remaining. By using past tense language, Tran misrepresented the status of the restraining order, creating the false impression that it had expired or was no longer valid. This misrepresentation was another calculated effort to undermine my legal protections and escalate the situation against me.

311.    Officer Victoria DENARDI also played a crucial role in this pattern of misconduct. On the probable cause statement related to the temporary restraining order, DENARDI falsely documented that I "violated their restraining order," implying that there was a mutual restraining order or relationship between JACKO and me. This was a deliberate mischaracterization, as the restraining order was temporary and had not yet been fully adjudicated, making it a one-sided order at that point. Later, when JACKO violated the two-year restraining order that I had obtained against him, DENARDI falsely documented the incident as "domestic violence," despite knowing that this was a neighbor dispute and not a domestic relationship.

312.    In addition to these specific false reports, there were numerous other instances of false reporting by various officers, where the narrative was slightly manipulated to favor JACKO and

further discredit me. These reports, while not detailed here, collectively contributed to the creation of a false narrative designed to justify the unlawful actions taken against me.

313.    These false reports were not isolated incidents but part of a broader, coordinated effort by the Defendants to discredit me and create a "paper trail" that would later be used to justify unlawful actions, including my arrest and imprisonment. By filing and using these fabricated documents, the Defendants violated my constitutional rights, particularly my right to due process and protection from false imprisonment.

314.    The Defendants' actions caused me significant harm, both emotionally and legally. The manipulation of the judicial system through the use of these false reports directly contributed to the wrongful acts committed against me, including my kidnapping on October 1st, 2019. WHEREFORE, I pray for relief as hereinafter set forth.

315.    Sixteenth Cause of Action: Allowing False 911 Calls and Coached False Narratives Plaintiff re-alleges and incorporates by reference paragraphs 1 through [last paragraph number] of this complaint. Defendants, including 911 dispatchers, allowed false 911 calls to be made by Moses JACKO Jr. and even coached him through the false narratives, despite knowing they were false. This included failing to document crimes and threats made by JACKO and instead building a false mental health narrative against Plaintiff.

316.    Notably, in one of the 911 calls, JACKO stated that the officers had advised him to call every time Plaintiff supposedly harassed him. In the background of this call, Officer John JACKO ROMERO can be heard instructing JACKO to "put it on file," confirming his involvement in the orchestration of these false narratives. A voice analysis conducted through Pratt has confirmed that it was indeed ROMERO's voice.

317.    Moreover, the level of familiarity between JACKO and the 911 dispatchers is concerning. For example, when JACKO initiated a call, he was greeted by the dispatcher with "Hi Mr. JACKO," indicating that he was well-known to the dispatchers. This unusual familiarity suggests

a lack of impartiality, raising further questions about the integrity of the responses to JACKO's repeated false reports.

318.    It is important to note that there are approximately 17 false 911 calls made by JACKO, all of which have contributed to the ongoing harassment and false imprisonment of Plaintiff. These calls, which are too numerous to detail individually here, will be submitted as exhibits to further illustrate the systemic abuse and manipulation Plaintiff has endured.

319.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

Seventeenth Cause of Action: Human Trafficking and Illegal Biometric SurveillancE.

320.    Plaintiff LaJuana A. Reid re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

321.    Plaintiff has been subjected to human trafficking through the use of illegal biometric surveillance, a violation of her fundamental rights. The surveillance has been enabled through the implantation of a radio frequency semiconductor device in her body, specifically behind her left knee. This device was confirmed by a licensed security specialist trained by the government, using a Non-Linear Junction Detector (NLJD) device, commonly used by law enforcement to detect electronic devices.

322.    On October 1st, 2019, Plaintiff was kidnapped by officers of the OAKLAND POLICE DEPARTMENT, who were tracking her movements through the illegally implanted device. Evidence of this illegal surveillance includes a store receipt from FoodMaxx showing Plaintiff's checkout time of 12:53 PM and an Oakland Police incident recall that was reset at precisely the same time. This reset was not coincidental; it demonstrates a deliberate act of tracking Plaintiff in real-time through the implant.

323.    The illegal biometric surveillance extended beyond tracking Plaintiff's location. On the day of the kidnapping, former Officer Mark WILSON trespassed into Plaintiff's home and recorded the layout of her residence with his body camera. He conducted a full 360-degree

sweep of the living room as if measuring the space and carefully walked through each room, lingering in the master bathroom as though he was listening to instructions through his earpiece. This systematic recording and monitoring of Plaintiff's home further enabled the tracking of her movements within her own residence, a gross invasion of privacy and an escalation of the human trafficking and illegal surveillance against her.

324.    This pattern of behavior is consistent with the broader context of illegal tracking and surveillance that Plaintiff has been subjected to for many years. The illegal tracking device implanted in her body not only allowed law enforcement to monitor her movements on October 1st, 2019, but it also explains how Patrick Wirth, an individual who stalked Plaintiff and whom she was granted a lifetime restraining order against in 2003, was able to continuously locate her despite her efforts to escape his harassment. This illegal surveillance, which began as early as her time in the foster care system under the supervision of the Department of Health and Human Services, has been used to perpetuate her trafficking, monitor her movements, and enable ongoing harassment.

325.    Plaintiff has made numerous requests for her foster care records (Foster Care No. 0247865), but these records have been systematically withheld. This refusal to release the records is part of a broader pattern of obstruction and cover-up, which further supports Plaintiff's assertion that her illegal watchlisting and surveillance began during her time in the foster care system. This long-term surveillance and harassment have continued into adulthood, contributing to the ongoing violations of her rights.

326.    Plaintiff has documented numerous instances where she has been followed, harassed, and surveilled by both civilians and law enforcement, all of which are consistent with the effects of being illegally implanted and tracked. Plaintiff has video evidence of civilians waiting in their cars to receive a signal indicating her presence, at which point they would begin coordinated gang-stalking behaviors. These actions are not random but are systematically orchestrated

through the use of the illegal implant, connected to a broader network of surveillance and harassment involving the Fusion Center and other law enforcement agencies.

327.    Plaintiff has been wrongfully targeted by the OAKLAND POLICE DEPARTMENT under their program aimed at monitoring and investigating prostitution and human trafficking activities. Despite having no history or involvement in prostitution, Plaintiff believes that she has been falsely categorized under this program. This mischaracterization has been used to justify the invasive surveillance, harassment, and trafficking she has endured. The misuse of resources intended for legitimate law enforcement purposes underscores the systemic abuse of power within the OAKLAND POLICE DEPARTMENT.

328.    The cumulative impact of these actions constitutes human trafficking, as Plaintiff has been unlawfully tracked, monitored, and subjected to coordinated harassment and intimidation. The use of this technology, the involvement of multiple law enforcement officers and agencies, and the failure of authorities to respond to her requests for assistance all point to a systemic violation of Plaintiff's rights.

329.    Plaintiff further asserts that she has been illegally watchlisted, as evidenced by her watchlist number (9596690-00) shown on an Oakland Police crime report. This watchlisting has facilitated the continuous surveillance and harassment she has endured, linking her to a broader network of illegal tracking and biometric surveillance.

330.    On October 1st, 2019, when Oakland Police officers went to obtain a false victim statement from Moses JACKO, they failed to inquire about the existence of a temporary restraining order. Instead, they fixated on the term "gang stalking," with Officer Mark WILSON repeatedly asking what "gang stalking" meant and why Plaintiff was calling the supposed victim a "gang stalker." This deflection from the core issue—whether there was a legitimate restraining order—demonstrates an intentional effort to misdirect the investigation and reinforce a narrative that discredits Plaintiff.

331.    The officers' focus on "gang stalking" and monitoring Plaintiff's social media underlines a deliberate attempt to frame Plaintiff as paranoid or delusional, thereby covering up the reality of the organized harassment program she has been subjected to. The term "gang stalking" is used to discredit anyone who mentions it, ensuring that victims like Plaintiff are dismissed as mentally unstable rather than acknowledging the illegal activities perpetrated against them. This strategy is consistent with COINTELPRO-like tactics used historically to suppress dissent and target individuals seen as threats to institutional corruption.

332.    Plaintiff has been subjected to continuous harassment under the guise of this "gang stalking" program, which involves civilians recruited to terrorize her as part of the OAKLAND POLICE DEPARTMENT's Ceasefire program. Despite the program's official purpose being to address gang violence and reduce crime, it has been repurposed to facilitate the organized stalking and harassment of individuals like Plaintiff who are illegally watchlisted. This program's misuse has led to a campaign of terror against Plaintiff, further contributing to the systemic human trafficking and biometric surveillance she has endured.

333.    The failure of the OAKLAND POLICE DEPARTMENT and other law enforcement agencies to address these violations, despite Plaintiff's numerous complaints and the overwhelming evidence she has provided, underscores the systemic nature of the trafficking and illegal surveillance against her. These agencies have not only failed in their duty to protect Plaintiff but have actively participated in or facilitated the continuous violations of her rights, from the illegal implantation of the tracking device to the coordinated harassment and surveillance that have followed.

334.    Plaintiff seeks immediate relief from this ongoing violation of her rights, including but not limited to:

- Cessation of all surveillance and tracking activities: An injunction against the OAKLAND POLICE DEPARTMENT and other involved agencies to immediately stop all forms of monitoring, tracking, and harassment.
- Compensation for damages: A financial award for the significant emotional, psychological, and physical distress suffered as a result of the illegal trafficking and surveillance, including punitive damages for the egregious violations of her constitutional rights.
- Public acknowledgment and accountability: A formal investigation into the conduct of the OAKLAND POLICE DEPARTMENT and associated individuals, with a public acknowledgment of the wrongdoing and appropriate disciplinary actions taken against those involved.

Monell Claim Against the City of Oakland

335.    This section addresses the Monell claim under 42 U.S.C. §1983 against the City of Oakland. The claim asserts that the City's policies, practices, and customs within the OAKLAND POLICE DEPARTMENT (Oakland Police) led to the violation of my constitutional rights. The City's failure to properly supervise, train, and discipline its officers, along with the ratification of unlawful actions, created an environment that allowed for systemic misconduct, including harassment, false imprisonment, illegal surveillance, and kidnapping.

Pattern or Practice of Constitutional Violations

336.    The City of Oakland, through the actions and inactions of its officials and supervisors, has established a pattern or practice of constitutional violations. These violations include, but are not limited to:

- Harassment and Illegal Surveillance: I was subjected to continuous harassment and illegal surveillance, including being watchlisted as subject number 9596690-00 without lawful justification. This surveillance was part of a broader pattern of targeting individuals within the community, particularly those who reported illegal activities or were perceived as threats.

- False Imprisonment and Kidnapping: On October 1st, 2019, I was kidnapped by Oakland Police officers under the direction of Officer John JACKO ROMERO, who orchestrated a series of false documents, including a fabricated police report and a fraudulent elder abuse restraining order, to justify the unlawful detention.

- Manufacturing of Evidence: Officer ROMERO, the only officer assigned to the Cannabis Unit, authored false reports and documents, including the RP card used to execute my kidnapping. These actions were part of a deliberate effort to manufacture probable cause and discredit me.

337.    This pattern of misconduct reflects a systemic issue within the Oakland Police, where unlawful actions were not only tolerated but encouraged as part of the department's culture.

Failure to Supervise, Discipline, or Train

338.    The City of Oakland failed to adequately supervise, discipline, or train its officers, allowing repeated violations of my constitutional rights. Despite clear evidence of misconduct by officers, including Officer ROMERO, the City did not take corrective action. Specific failures include:

- Lack of Accountability: Oakland Police supervisors failed to address the unlawful actions of Officer ROMERO, despite his blatant violations of departmental rules and constitutional rights. The City's failure to hold him accountable allowed the continuation of illegal activities, including my kidnapping.

- Inadequate Training: The City did not provide sufficient training to officers on respecting constitutional rights, particularly in handling sensitive cases involving surveillance, restraining orders, and community relations. This lack of training contributed to the officers' reckless disregard for my rights.

Ratification of Misconduct

339.    High-ranking officials within the City of Oakland ratified the unconstitutional actions of Oakland Police officers by failing to intervene or correct their behavior. This ratification effectively endorsed the misconduct, making it part of the City's official policy. Examples include:

- Approval of False Documents: The City allowed the use of fabricated police reports and false restraining orders, which were instrumental in my unlawful detention. By not correcting these actions, the City signaled its approval of the illegal conduct.
- Failure to Act on Complaints: Despite numerous complaints and Freedom of Information Act (FOIA) requests, the City did not take any action to address the unlawful surveillance, harassment, and false imprisonment I experienced. This inaction further demonstrates the City's complicity in the violations.

Violation of OAKLAND POLICE DEPARTMENT Memoranda

340.    The Oakland Police violated its own rules and regulations, which were designed to prevent the very misconduct that occurred in my case. Specific violations include:

- Rule 398.80 (Truthfulness) and 398.96 (Participation in Civil Matters for Family Members): Officer ROMERO violated these rules by fabricating reports and participating in civil matters to benefit his cousin, who was involved in illegal cannabis operations.

- Rule 370.81 (Assisting Criminals): Officer ROMERO assisted his cousin in maintaining an illegal cannabis operation by retaliating against me for reporting it. This retaliation included false reports and coordinated harassment.

These violations were not addressed by the City, further demonstrating a systemic failure to enforce its own policies.

Deliberate Indifference

341.    The City's actions, or lack thereof, amounted to deliberate indifference to my constitutional rights. The City was aware of the ongoing violations but chose not to act, thereby encouraging the continued abuse of power by Oakland Police officers. This deliberate indifference is evident in:

- Ignoring Evidence of Misconduct: Despite being aware of the false reports, illegal surveillance, and harassment, the City did nothing to stop these actions or hold the responsible officers accountable.
- Obstructing Justice: The City, through its officials, obstructed my efforts to obtain justice by delaying FOIA responses, withholding evidence, and allowing the perpetrators of the misconduct to control the investigation.

**Conclusion**

342.    The City of Oakland, through its policies, practices, and customs, directly contributed to the violations of my constitutional rights. The systemic failure to supervise, train, and discipline Oakland Police officers, coupled with the ratification of unlawful actions, fostered an environment where misconduct was not only possible but expected. As a result, the City bears liability under Monell for the extensive harm I have endured.

343.   The overwhelming evidence I have gathered—thousands of documents, recordings, and other materials—clearly substantiates the systemic harassment and violations perpetrated against me. While it is foreseeable that the opposing parties may attempt to discredit me by labeling me as delusional, such claims are entirely baseless and serve only as a distraction from the incontrovertible evidence of misconduct and corruption.

344.   This is not conjecture; it is a meticulously documented case, firmly rooted in verifiable facts. Any attempt to dismiss my claims as delusional collapses under the weight of the clear and indisputable record I have presented. The evidence and exhibits accompanying this pleading will speak for themselves, leaving no doubt as to the truth of my allegations and the urgent need for accountability and justice.

## **STATUTORY AUTHORITIES**

345.   This section outlines the federal and state statutes relevant to this complaint. Each statute supports specific claims and demonstrates the legal basis for the causes of action alleged.

Federal Statutes:

- 5 U.S.C. § 552a (Privacy Act): Governs the handling of personal records by federal agencies, prohibiting unauthorized surveillance, data collection, and disclosure without consent.
- 5 U.S.C. § 552a(b)(7): Bars the disclosure of personal records for non-law enforcement purposes without consent.
- 18 U.S.C. § 241 (Conspiracy Against Rights): Criminalizes conspiracies to violate constitutional rights, applicable to organized gang-stalking and surveillance.
- 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law): Prohibits law enforcement officers from depriving individuals of rights through unlawful acts.

- 18 U.S.C. § 1001 (False Statements): Criminalizes false statements or fraudulent filings to government agencies.
- 18 U.S.C. § 1030 (Computer Fraud and Abuse Act): Prohibits unauthorized access to computer systems, including electronic surveillance and hacking.
- 18 U.S.C. § 1201 (Kidnapping): Addresses unlawful detention and abduction, relevant to false imprisonment claims.
- 18 U.S.C. § 1117 (Conspiracy to Commit Murder): Punishes those who conspire to commit murder.
- 18 U.S.C. § 1346 (Honest Services Fraud): Targets corruption by public officials, covering deprivation of honest services.
- 18 U.S.C. § 1510 (Obstruction of Criminal Investigations): Prohibits interference with investigations, including evidence tampering.
- 18 U.S.C. §§ 1512, 1519 (Witness/Evidence Tampering): Criminalizes tampering with witnesses and destruction of evidence.
- 18 U.S.C. § 1591 (Human Trafficking): Targets trafficking through force, fraud, or coercion.
- 18 U.S.C. § 1621 (Perjury): Criminalizes making false statements under oath.
- 18 U.S.C. §§ 1961–1968 (RICO): Provides civil and criminal remedies for organized patterns of criminal activity, including law enforcement corruption.
- 18 U.S.C. §§ 2340–2340A (Torture): Prohibits acts of severe physical or mental pain inflicted under authority.
- 18 U.S.C. § 2511 (Wiretap Act): Prohibits unauthorized interception of communications, supporting illegal surveillance claims.
- 42 U.S.C. §§ 1983, 1985, 1986 (Civil Rights Violations):
  - §1983: Addresses deprivation of rights under color of law.

o    §1985: Targets conspiracies to violate civil rights.

o    §1986: Provides action against failure to prevent such violations.

California State Statutes:

●    California Civil Code § 52.1 (Bane Act): Prohibits interference with constitutional rights through threats, intimidation, or coercion.

●    California Civil Code §§ 44–46 (Defamation - Libel/Slander): Covers false statements harming reputation.

●    California Civil Code § 3294 (Punitive Damages): Allows for punitive damages in cases of malice or oppression.

●    California Penal Code § 118.1 (False Police Reports): Criminalizes false police reporting by officers.

●    California Penal Code §§ 182, 187 (Conspiracy to Commit Crime/Murder): Addresses conspiracy and murder.

●    California Penal Code §§ 207, 236 (Kidnapping/False Imprisonment): Applies to false detention and unlawful restraint.

●    California Penal Code § 206 (Torture): Criminalizes acts of physical and psychological torture.

●    California Penal Code §§ 135, 141 (Evidence Tampering): Punishes destruction or falsification of evidence.

●    California Penal Code § 240 (Assault): Broadly covers threats and physical violence.

●    California Penal Code § 243.4 (Sexual Battery): Addresses unwanted physical contact.

●    California Penal Code § 273.6 (Violation of Protective Order): Covers failure to enforce protective orders.

- California Penal Code §§ 422, 422.6 (Criminal Threats/Hate Crimes): Addresses threats and violence based on discrimination.
- California Penal Code § 459 (Burglary): Covers unlawful entry into private property.
- California Penal Code § 602 (Trespassing): Criminalizes unauthorized entry onto property.
- California Penal Code § 632 (Invasion of Privacy): Prohibits unauthorized recording of communications.
- California Penal Code § 646.9 (Stalking): Punishes ongoing harassment or stalking.
- California Penal Code § 647 (Disorderly Conduct): Addresses public misconduct.

### DEMAND FOR JURY TRIAL

346.    PLAINTIFF hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

347.    WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1. Injunctive Relief:

Plaintiff seeks the following injunctive relief:

- Immediate termination of employment for Officers John JACKO ROMERO, VICTORIA LYNN DENARDI, JANEY LORRAINEMEEKS-HAY, and MARK WOODROW WILSON and GORDON DORHAM from the OAKLAND POLICE DEPARTMENT or any other law enforcement agency due to egregious misconduct.
- Decertification of these officers, barring them from holding future positions in law enforcement.
- Initiation of criminal investigations and prosecution of these officers for kidnapping, intentional infliction of emotional distress, false imprisonment, and related criminal conduct.

- Permanent removal of Plaintiff from all government watchlists, including Watchlist Number 9596690-900, and cessation of organized gang stalking, COINTELPRO tactics, and biometric surveillance. This includes the dismantling of any programs or operations used to target, monitor, or harass Plaintiff under the guise of national security or law enforcement.

- Policy reforms within the OAKLAND POLICE DEPARTMENT, including:

○ Comprehensive retraining of officers on unlawful detentions, searches, and FOIA request handling.

○ Specific training addressing the misuse of law enforcement powers for personal vendettas or to protect illegal activities involving officers' family members.

2. General and Special Damages:

- For general damages, including emotional distress, pain, and suffering, and special damages, including wage loss, income loss, medical expenses, and costs related to ongoing surveillance and illegal watchlisting, in an amount to be determined at trial.

3. Punitive and Exemplary Damages:

- For punitive and exemplary damages against Defendants who acted with malice, fraud, oppression, or reckless disregard for Plaintiff's constitutional rights, in an amount not less than $50 million to punish and deter further misconduct.

4. Statutory Damages:

- For statutory damages under 42 U.S.C. § 1983 for the violation of Plaintiff's civil rights.

5. Attorney's Fees:

- For reasonable attorney's fees and costs as provided by 42 U.S.C. § 1988 and any other applicable law, should Plaintiff prevail in this action.

6. Costs of Suit:

●     For all costs incurred, including filing fees, service of process, and litigation expenses associated with bringing this action.

7. Prejudgment Interest:

●     For prejudgment interest as permitted by law, compensating Plaintiff for the loss of use of any money due from the time the claim arose until the judgment is entered.

8. Further Relief:

●     For such other and further relief as the Court may deem just and proper, including any equitable remedies necessary to prevent ongoing or future harm to Plaintiff.

Dated: January 10, 2025

LAJUANA A. REID

Pro Se

COMPLAINT

-END

# EXHIBIT ___

## OAKLAND POLICE CRIME REPORT 19-051168 WITH MY WATCH LIST SUBJECT #**9596690-00**



5537                    SERVED?:YES
          ISS:09182019
    CRT:01120  TYPE:TEA AGCY:1013J
              SEX:X
  PERSON *****        SUBJ:9596690-00
    CUSTODY:  VISIT:  FIREARMS PROVISION: B
  :CTED*.                 YDS:  5
  ------------------------------

**Exhibit: Illegal Watchlisting (SUBJ: 9596690-00), Oakland Police Crime Report No. 19-051168**

This exhibit presents evidence that I have been illegally watchlisted under the identifier **SUBJ: 9596690-00**, as shown in Oakland Police Crime Report No. 19-051168. This watchlist designation dates back to **1998** and possibly earlier. During this time, I have repeatedly been denied justice, and incidents of harassment and unlawful surveillance have persisted, with Oakland Police consistently failing to respond to or address my complaints adequately.

The watchlist number, associated with the events of October 1st, 2019, when I was unlawfully detained and kidnapped, indicates that law enforcement agencies have systematically tracked and surveilled me for decades, in violation of my civil rights and constitutional protections.

This illegal watchlisting status plays a critical role in the broader pattern of harassment, organized stalking, and unlawful behavior modification experiments that I have endured for years. It has also justified continuous surveillance, monitoring, and biometric tracking, all without my knowledge or consent.

This exhibit establishes that my placement on this watchlist, without legitimate cause, is central to the ongoing violations against me. The connection between the watchlist and the use of surveillance technologies, such as stingrays and biometric tracking methods, underscores the unlawful actions taken by law enforcement.

The illegal watchlisting and resulting surveillance have had a profound impact on my life, contributing to the continuous violation of my rights and liberties. These actions demand accountability and justice.



# Oakland Police Department

**455 - 7th Street**
**Oakland, CA 94607**

☐ Supplemental

## Crime Report

| OCCURRED | DATE | TIME | DAY | PREMISE TYPE | | CAD INCIDENT | | RD # | |
|---|---|---|---|---|---|---|---|---|---|
| ON OR FROM | 01 OCT 19 | 0800 | Tuesday | Highway/Road/Alley/Street/Sidewalk | | LOP191001000221 | | 19-051168 | |
| TO | 01 OCT 19 | 0826 | Tuesday | ADDRESS / LOCATION | | | | BFO | BEAT |
| REPORTED | 01 OCT 19 | 1809 | Tuesday | 7839 7839 LOCKWOOD ST ST, Oakland, CA 94621  (At: 166(C)(1)Pc:IC:Sgt Bowling) | | | | 2 | 30X |

☐ PHOTOS TAKEN    ☐ PRINTS OBTAINED    TECHNICIAN

| LOCATION TYPE: | | ☐ DOMESTIC VIOLENCE | ☐ SENIOR INVOLVED | ☐ GANG RELATED | ☐ DRUGS INVOLVED |
|---|---|---|---|---|---|
| OUTSIDE REPORTING AGENCY | | SOLVABILITY FACTORS | ☐ SERIOUS INJURY  ☐ SUSPECT IN CUSTODY | ☐ IDENTIFIABLE SUSPECT  ☐ SURVEILLANCE PHOTO | ☑ EVIDENCE  ☑ NAMED SUSPECT  ☐ R/O REQUESTS INVEST. |

| Weapon Used | None |
|---|---|
| DGO K-4 Force Reported | No |
| Theft Type | |
| Burglary Type | |
| Method of Entry | None |
| Location of P.O.E. | |
| Point of Entry | |
| Location | Highway/Road/Alley/Street/Sidewalk |

| OFFENSE 1 | COUNTS | STATUTE / CODE | DESCRIPTION |
|---|---|---|---|
| | 1 | PC166 (C)(1) | CONTEMPT OF COURT:VIOLATE PROTECTIVE ORDER/ETC |

| CRIME ENHANCEMENT | ☐ PARTY TO CRIME  ☐ DOMESTIC VIOLENCE | ☐ CONSPIRACY  ☐ GANG RELATED | ☐ ARMED  ☐ SOLICITED | ☐ ATTEMPTED  ☐ HATE CRIME | HATE CRIME MOTIVATION |
|---|---|---|---|---|---|

| VICTIM 1 | LAST, FIRST, MID. | | | | | | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jacko, Moses | | | | | | | M | B | | |
| HOME ADDRESS | | | | ALIAS NAME (LAST, FIRST) | | | | HAIR | EYES | SSN | |
| | | | | | | | | BRO | BRO | | |
| HOME PHONE | | CELL PHONE | | | PAGER | | | HEIGHT | | WEIGHT | |

| EVENT ASSOC | ETHNICITY | | CONTACT DATE/TIME | DRIVERS LICENSE # | | LICENSE EXP | LIC. STATE | ☐ GANG ASSOCIATION | |
|---|---|---|---|---|---|---|---|---|---|
| Victim | Not of Hispanic Origin | | 01 OCT 19 / 1740 | | | | | | |

| OCCUPATION | EMPLOYER / SCHOOL | WORK HOURS |
|---|---|---|
| | | |

| BUSINESS ADDRESS / SCHOOL | | WORK PHONE |
|---|---|---|
| | | |

| VICTIM TYPE | INJURY SEVERITY | TREATED BY |
|---|---|---|
| Individual | | |

INJURY DESCRIPTION

| REPORTED BY | SERIAL | BEAT | BFO | SUPERVISOR | SERIAL | REVIEWER | SERIAL |
|---|---|---|---|---|---|---|---|
| Officer C Carrillo | 9773 | 30X | 2 | Sergeant B Mathews | 8874 | OFF Carlos Carrillo | 9773 |

ORI 00109

P1

# Oakland Police Department

455 - 7th Street  Oakland, CA 94607

## Crime Report - Continued

| OCCURRED | DATE | TIME | DAY | PREMISE TYPE | | CAD INCIDENT | | RD # | |
|---|---|---|---|---|---|---|---|---|---|
| ON OR FROM | 01 OCT 19 | 0800 | Tuesday | Highway/Road/Alley/Street/Sidewalk | | LOP191001000221 | | 19-051168 | |
| TO | 01 OCT 19 | 0826 | Tuesday | ADDRESS / LOCATION | | | | BFO | BEAT |
| REPORTED | 01 OCT 19 | 1809 | Tuesday | 7839 7839 LOCKWOOD ST ST, Oakland, CA 94621  (At: 166(C)(1)Pc:IC:Sgt Bowling) | | | | 2 | 30X |

| ☐ PHOTOS TAKEN | ☐ PRINTS OBTAINED | TECHNICIAN |
|---|---|---|

| SUSPECT 1 | LAST, FIRST, MID. | | | | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|---|---|
| | Reid, Lajuana | | | | | F | B | 19 JUL 60 | 59 |
| HOME ADDRESS | | ALIAS NAME (LAST, FIRST) | | | | HAIR | EYES | SSN | |
| 7839 Loockwood , Oakland, CA 94621 | | | | | | BRO | BRO | | |
| HOME PHONE | CELL PHONE | | PAGER | | | HEIGHT | | WEIGHT | |
| | (510)201-9013 | | | | | 5'4" | | 120 | |
| EVENT ASSOC | ETHNICITY | | DRIVERS LICENSE # | LICENSE EXP. | LIC. STATE | ☐ GANG ASSOCIATION | | | |
| Suspect | Not of Hispanic Origin | | | | | | | | |
| OCCUPATION | | EMPLOYER / SCHOOL | | | | | | WORK HOURS | |
| | | | | | | | | | |
| BUSINESS ADDRESS / SCHOOL | | | | | WORK PHONE | | | | |

| DESC | | PERSON DESCRIPTORS FOR SUSPECT 1 | |
|---|---|---|---|
| | **Feature** | **Description** | |
| | Demeanor | Polite, Calm | |

| | OFFICER NAME | SERIAL NO. | | ROLE | BEAT | BFO |
|---|---|---|---|---|---|---|
| OFFICER 1 | Officer C Carrillo  9773 | | | RO | 30X | 2 |
| OFFICER 2 | Sergeant B Mathews  8874 | | | ROSUP | | 2 |
| OFFICER 3 | OFF Carlos Carrillo  9773 | | | REV | 30X | 2 |

## Narrative

On 1 Oct 19, at about 1828hrs, I was working as OPD Patrol Unit 2L30. I was wearing full police uniforms and I was driving fully marked patrol vehicle 1554. I was dispatched to 7839 LOCKWOOD ST to investigate report of a neighbor disturbance.

Upon arrival, Officer M. Wilson made contact with V1 and he advised that he had a restraining order against his neighbor S1.

Officer M. Wilson took a PDRD statement from V1. This statement in not verbatim. See PDRD statement for further details.

V1 stated that he walked outside of his house located at 7833 LOCKWOOD ST on 1 Oct 19, at about 0800hrs to take the trash out. At that time he noticed S1 watering her lawn. V1 advised that for unknown reasons S1 started calling him "Gang Stalker" and said "I have a "Iva Nail" which is V1 deceased mothers name. V1 also showed Officer M. Wilson S1's Facebook page which showed posts related to V1. V1 then walked back into his residence and contacted the police regarding this matter.

V1 advised that he wanted to press charges against S1 for violating the restraining order listed below by verbal harassment.

```
----------------------------------------------------------------
A 1 RESTRAINING ORD   NBR:HF19035537           SERVED?:YES
   REID,LAJUANA                      ISS:09182019
   PROTECTED PERSON:         CRT:01120 TYPE:TEA AGCY:1013J
   JACKO,MOSES JR                   SEX:X
   ***** MATCH MADE ON PROTECTED PERSON *****   SUBJ:9596690-00
   ORDERS: CONTACT PROTECTED: N  CUSTODY:  VISIT:  FIREARMS PROVISION: B
   STAY AWAY: *RESIDENCE*  *PROTECTED*          YDS:  5
```

| REPORTED BY | SERIAL | BEAT | BFO | SUPERVISOR | SERIAL | REVIEWER | SERIAL |
|---|---|---|---|---|---|---|---|
| Officer C Carrillo | 9773 | 30X | 2 | Sergeant B Mathews | 8874 | OFF Carlos Carrillo | 9773 |

ORI 00109

P2

# Oakland Police Department

455 - 7th Street    Oakland, CA 94607

## Crime Report - Continued

| OCCURRED | DATE | TIME | DAY | PREMISE TYPE | CAD INCIDENT | | RD # | |
|---|---|---|---|---|---|---|---|---|
| ON OR FROM | 01 OCT 19 | 0800 | Tuesday | Highway/Road/Alley/Street/Sidewalk | LOP191001000221 | | 19-051168 | |
| TO | 01 OCT 19 | 0826 | Tuesday | ADDRESS / LOCATION | | | BFO | BEAT |
| REPORTED | 01 OCT 19 | 1809 | Tuesday | 7839 7839 LOCKWOOD ST ST, Oakland, CA 94621  (At: 166(C)(1)Pc:IC:Sgt Bowling) | | | 2 | 30X |
| ☐ PHOTOS TAKEN | | ☐ PRINTS OBTAINED | | TECHNICIAN | | | | |

### Narrative (Continued)

Officer M. Wilson and Officer V. Denardi advised that S1 came out of her house and approached them to explain her side of the story.

At that time, S1 was detained and searched incident to arrest.

I made contact with S1. I admonished and took a PDRD statement from S1. This statement in not verbatim. See PDRD statement for further details.

S1 stated that she was outside her residence watering her lawn. S1 stated, that she did not see V1 outside her residence. S1 also stated that she was on her phone and said her own nickname out loud (S1 stated that V1 said her nickname yesterday and she was unsure how V1 knew her nick name). S1 said that she did not make any direct comments to V1.

Both parties were parties were provided a report number and OPD resources.

S1 was transported by OPD Wagon to Santa Rita Jail for 166(C)(1)PC CONTEMPT OF COURT:VIOLATE PROTECTIVE ORDER/ETC.

PDRD activated.

| REPORTED BY | SERIAL | BEAT | BFO | SUPERVISOR | SERIAL | REVIEWER | SERIAL |
|---|---|---|---|---|---|---|---|
| Officer C Carrillo | 9773 | 30X | 2 | Sergeant B Mathews | 8874 | OFF Carlos Carrillo | 9773 |

ORI 00109

P3

# PRE-DISCOVERY EXHIBIT

## MOTIVE

1. ILLEGAL CANNABIS CULIVATION operation next door of Moses Jacko, Jr.


2. Officer John Jacko Romero,  Oakland Police Cannabis Unit



Oakland Police John Romero's cousin illegal cannabis at 7833 Lockwood St., Oakland, CA 94621
In lieu of conducting a raid on Romero's cousin, Oakland Police kidnapped me.





**CITY OF OAKLAND**
**Office of the City Administrator**

NUISANCE ABATEMENT • SPECIAL ACTIVITY PERMIT
1 Frank H. Ogawa Plaza, 11th Floor • Oakland, CA 94612

Greg Minor, Assistant to the City Administrator
email: gminor@oaklandca.gov

Phone: 510-238-6370
Fax: 510-238-7084

<u>Certified Mail</u>

September 30, 2020

Michael & Billy Ayers ETAL



Moses Jacko, Jr., of
7833 Lockwood Street Illegal cannabis.

RE: **illegal cannabis cultivation operation – cease and desist**
**7833 Lockwood St., Oakland, CA**

Dear Property Owners,

It has come to our attention that you or your tenant are cultivating cannabis at 7833 Lockwood Street, Oakland, CA without a cultivation permit or a state license at 7833 Lockwood Street, Oakland, CA. As no valid permits exists to operate a cultivation facility at this address, **you must cease your unlawful operation immediately.** Failure to do so will subject you to criminal, civil and administrative enforcement action by the City of Oakland.

Please contact Susan Vasquez via email at <u>svasquez@oaklandca.gov</u> to confirm the activity has been abated and **to schedule an inspection.** Thank you in advance for your cooperation.

Sincerely,

Greg Minor
Assistant to the City Administrator



Enclosure: Proof of service

cc: Officer J. Romero, OPD (via email)
R. Walker, Planning/Building Dept. (via email)
Special Activity Permits (via email)
E. Reiskin, City Administrator (via email)

Moses Jacko, Jr's cousin,
Oakland Police, Cannabis Unit, John "Jacko" Romero

**Officer John Jacko Romero raids Zide church for cannabis, from an anonymous tip provided May 2019**

Oakland Police John Romero's cousin illegal cannabis at 7833 Lockwood St., Oakland, CA 9462
In lieu of conducting a raid on Romero's cousin, Oakland Police kidnapped me.





Instead of Romero raiding his cousins house like he did Zide church, Romero had me (LaJuana A. Reid) his cousins neighbor arrested.

davehemp Video from the start of the Raid. We are a peaceful Church, they could have come in with no weapons and accomplished the exact same thing. We are not a cartel and neither cannabis or mushrooms make people violent. Is this really the best use of resources when we are in the middle of a crime wave in Oakland? How many assaults, carjackings, and murders happened while the police were wasting their time...